KARCHES ET AL., APPELLANTS, *v.* CITY OF CINCINNATI, APPELLEE.

[Cite as Karches *v.* Cincinnati (1988), 38 Ohio St. 3d 12.]

(No. 87-830—Submitted February 16, 1988—Decided July 20, 1988.)

*Waite, Schneider, Bayless & Chesley Co., L.P.A., Stanley M. Chesley* and *Philip B. Allen,* for appellants.

*Richard A. Castellini,* city solicitor, *Ely M. T. Ryder* and *Jerry F. Luttenegger,* for appellee.

H. Brown, J. The appellants have challenged the constitutionality of the zoning of their properties by the city of Cincinnati. We must decide, first, whether the challenge is ripe for determination. If the answer is in the affirmative, we may consider the merits of the constitutional attack.

## I

The court of appeals held that the issue of the constitutionality of the RF-1 zoning as applied to the properties of appellants was not ripe for judicial review "* * * because the City had not reached a final decision regarding the application of the zoning regulations to the two tracts." The court relied upon the two-step process of determining ripeness set forth in *Williamson Cty. Regional Planning Comm.* v. *Hamilton Bank of Johnson City* (1985), 473 U.S. 172, 193.

The first step is a requirement of finality. That is met when "* * * the initial decisionmaker has arrived at a definitive position on the issue that in-

flicts an actual, concrete injury." The second step requires an injured party to exhaust any available administrative remedies prior to instituting a suit for judicial relief. The *Williamson Cty.* test for ripeness was approved in *MacDonald, Sommer & Frates* v. *County of Yolo* (1986), 477 U.S. 340. We accept the holdings in *Williamson Cty.* and *County of Yolo,* but disagree with the determination by the court of appeals that no definitive position had been taken by Cincinnati.

## A

The court of appeals ruled that the city had not reached a final definitive position because appellants did not, *on the basis of a specific proposed use,* (1) petition for a zoning change, or (2) apply for a building permit. The appellate court reasoned that without a refusal by the city *to allow a specific use,* no final definitive position had been taken by the city.

We disagree. Denial by the city of a specific proposed use is not necessary to a finding that the city has taken a final definitive position sufficient to satisfy the test of ripeness. In making denial of a specific proposed use its focus, the court of appeals failed to recognize that, in Ohio, the constitutionality of a zoning ordinance may be attacked in two ways. An appeal from an administrative zoning decision can be taken pursuant to R.C. Chapter 2506. In addition, or in the alternative, a declaratory judgment action pursuant to R.C. Chapter 2721 can be pursued. A short examination of the two actions will reveal the differences between them, including the significant difference that denial of a specific proposed purpose is pivotal to the ripeness determination in an R.C. Chapter 2506 proceeding but not to the ripeness determination in a declaratory

judgment action pursuant to R.C. Chapter 2721.

An appeal from a final administrative decision denying a property owner a variance is filed under R.C. Chapter 2506. Such an action is similar to the one in *Williamson Cty., supra.* In the past, the R.C. Chapter 2506 appeal appeared to be the exclusive method of challenging zoning restrictions in Ohio. See, generally, *Mobil Oil Corp.* v. *Rocky River* (1974), 38 Ohio St. 2d 23, 67 O.O. 2d 38, 309 N.E. 2d 900; *State, ex rel. Sibarco Corp.,* v. *Berea* (1966), 7 Ohio St. 2d 85, 36 O.O. 2d 75, 218 N.E. 2d 428. A property owner who failed to seek legislative change of a zoning restriction seemed to be precluded from using declaratory judgment to contest the constitutionality of the restriction.

However, in *Driscoll* v. *Austintown Associates* (1975), 42 Ohio St. 2d 263, 71 O.O. 2d 247, 328 N.E. 2d 395, we dispelled any doubt that a declaratory judgment action could be used to challenge the constitutionality of a zoning ordinance. We held that in light of Civ. R. 57 (which provides in part that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate"), a declaratory judgment action, filed pursuant to R.C. Chapter 2721, is available as an alternative remedy for such attacks. *Driscoll, supra,* at 268-269, 71 O.O. 2d at 250, 328 N.E. 2d at 400. The complaint in the present case seeks a declaratory judgment pursuant to R.C. Chapter 2721 on the ground that the zoning as applied to appellants' properties is unconstitutional.

Although both an R.C. Chapter 2506 action and an R.C. Chapter 2721 declaratory judgment action seek the same result—elimination of an existing zoning regulation which precludes a proposed use of the property—any similarity between the two actions ends

there. *Driscoll, supra,* at 270, 71 O.O. 2d at 251, 328 N.E. 2d at 401.

The R.C. Chapter 2506 appeal is a judicial review of a final administrative decision denying a variance to a property owner. The challenge is that a prohibition against a specific proposed use is unconstitutional; and the task of the trial court is to determine whether the prohibition against the specific proposed use has any reasonable relationship to the legitimate exercise of police power by the municipality. *Mobil Oil Co., supra.* Thus, the determination turns on the specific proposed use of the property.

In contrast, a declaratory judgment action challenges the constitutionality of an existing zoning ordinance. The action does not call into issue the denial of a variance, even though, as discussed subsequently, exhaustion of the administrative variance procedure is usually required prior to initiating a declaratory judgment action. *Driscoll, supra,* at paragraph four of the syllabus. The overall constitutionality of a zoning ordinance as applied to a particular parcel of property is the central question. It may, but need not, involve a question as to the constitutionality of a prohibition against a specific proposed use. The declaratory judgment action is independent from the administrative proceedings and it is not a review of a final administrative order.

The distinction between the two actions is important because in an R.C. Chapter 2506 appeal, the trial court need not make an objective determination of the overall constitutionality of a zoning ordinance. It will view the constitutional issue only in light of the proposed specific use. If the court finds the restriction against the proposed use valid, its inquiry ends. In making such a limited determination, it is possible that the existing zoning could

be unconstitutional, but the zoning would not be declared unconstitutional because the prohibition against the specific proposed use is valid. See, generally, *Central Motors Corp.* v. *Pepper Pike* (1979), 63 Ohio App. 2d 34, 13 O.O. 3d 347, 409 N.E. 2d 258; *Flair Corp.* v. *Brecksville* (1976), 49 Ohio App. 2d 77, 3 O.O. 3d 146, 359 N.E. 2d 459.

A declaratory judgment action lies when a party challenges a zoning ordinance as it applies to a specific parcel of property to proscribe the owner's proposed use of the property. *Driscoll, supra;* see, also, *Superior Uptown* v. *Cleveland* (1974), 39 Ohio St. 2d 36, 68 O.O. 2d 21, 313 N.E. 2d 820; *Kaufman* v. *Newburgh Heights* (1971), 26 Ohio St. 2d 217, 55 O.O. 2d 462, 271 N.E. 2d 280; *Burt Realty Corp.* v. *Columbus* (1970), 21 Ohio St. 2d 265, 50 O.O. 2d 491, 257 N.E. 2d 355; and *Willott* v. *Beachwood* (1964), 175 Ohio St. 557, 26 O.O. 2d 249, 197 N.E. 2d 201. An actual controversy exists when persons aver that their rights, status or other legal relations have been affected by an allegedly invalid ordinance. See *Pack* v. *Cleveland* (1982), 1 Ohio St. 3d 129, 1 OBR 166, 438 N.E. 2d 434; *Schaefer* v. *First Natl. Bank of Findlay* (1938), 134 Ohio St. 511, 13 O.O. 129, 18 N.E. 2d 263.

Accordingly, we hold that a prerequisite to a determination that an actual controversy exists in a declaratory judgment action is a final decision concerning the application of the zoning regulation to the specific property in question. Once a controversy is established, jurisdiction is successfully invoked and the issue of constitutionality becomes ripe for determination.

In the present case, appellants alleged that their properties could not be developed in a reasonably beneficial manner within the confines of the RF-1 ordinance. They petitioned the city for

a change in use, which the city denied. The record and the findings by the trial court support this allegation. Appellants have shown that the city has taken a definitive position on the zoning issue—a position which inflicts a concrete injury.

B

Prior to instituting a declaratory judgment action to determine the validity of a zoning ordinance as applied to a specific parcel of property, a party ordinarily must exhaust administrative remedies. *Driscoll, supra,* at paragraph four of the syllabus; see, also, *Cook-Johnson Realty Co.* v. *Bertolini* (1968), 15 Ohio St. 2d 195, 44 O.O. 2d 160, 239 N.E. 2d 80, and *Williamson Cty., supra.* In the case at bar, the city asserted failure to exhaust administrative or other remedies as its second defense in its answer to the amended complaint. *Gannon* v. *Perk* (1976), 46 Ohio St. 2d 301, 75 O.O. 2d 358, 348 N.E. 2d 342; *Driscoll, supra.* This issue, under our analysis, becomes the critical one in making a determination of ripeness.

Two exceptions to the general rule exist. First, if there is no administrative remedy available which can provide the relief sought, *Kaufman, supra,* or if resort to administrative remedies would be wholly futile, exhaustion is not required. *Glover* v. *St. Louis-San Francisco Ry. Co.* (1969), 393 U.S. 324; *County of Yolo, supra,* at 352, fn. 8, and 358-359 (White, J., dissenting). Second, exhaustion of remedies is unnecessary when the available remedy is onerous or unusually expensive. *Gates Mills Investment Co.* v. *Pepper Pike* (1975), 44 Ohio St. 2d 73, 73 O.O. 2d 321, 337 N.E. 2d 777; *Burt Realty Corp., supra.*

The trial court found that appellants were not required to exhaust administrative or other remedies prior to seeking a declaratory judgment action under the first exception to this principle. The record substantiates the finding. Appellants' unsuccessfully sought a change in zoning from the city over an extended period of time. The most significant of these efforts is the 1977 Karches petition to the city to change the zoning from RF-1 to RF-2 and Flerlage's reliance upon that petition.[3] The city ultimately denied the request.

Any regulatory taking determination is closely bound to the facts of the particular case. Frequently, an ongoing process is the way in which the decision is made. The purpose of the "final decision" requirement is to ensure that the court will know the nature and extent of permitted development before adjudicating the validity of the regulation that purports to limit it. *First English Evangelical Lutheran Church* v. *Cty. of Los Angeles* (1987), 482 U.S. \_\_\_, 96 L. Ed. 2d 250, 107A S. Ct. 2378; *County of Yolo, supra; Williamson Cty., supra; San Diego Gas & Elec. Co.* v. *San Diego* (1981), 450 U.S. 621; *Agins* v. *Tiburon* (1980), 447 U.S. 255. The necessity is to pinpoint the final position of the decisionmaker. Neither repeated applications and denials nor patently fruitless measures to obtain relief are required.

Furthermore, appellants were not required to seek a variance to allow them to operate river terminals because that is a nonconforming use under the RF-1 classification. The director of buildings and inspections is without authority to grant a variance for "a use contrary to the use regulations of the applicable zoning dis-

---

[3] Richard Flerlage testified at the 1977 hearing concerning the Karches petition that if the petition were granted, he would request a zoning change for his property.

trict."[4] An appeal to the zoning board of appeals would have been equally futile since the board must act in conformity with the zoning code and, consequently, is not empowered to grant a variance permitting a nonconforming use.[5]

The conclusion (that no remedy was available which could have provided appellants with the relief requested) is supported by testimony of counsel for the city at trial. In response to questioning from the bench, counsel confirmed that the city would not grant appellants a variance or a change in use.[6] A municipality is not necessarily bound by on-the-record assertions made by its counsel. However, in this instance, it is clear from the transcript that counsel was reiterating the long-held position of the city concerning the zoning of the properties in question.

We hold that the challenge to the constitutionality of the zoning regulation is ripe for judicial determination and reverse the ruling of the court of appeals as to the ripeness issue.

## II

We turn to the issue of whether the trial court erred in finding the ordinance unconstitutional. The city urges us to remand the case to the court of appeals for a decision on this issue. In the interest of judicial economy, since the case is before us accompanied by a comprehensive record, and since the trial court made detailed findings of fact, we have decided to ex-

---

[4] Cincinnati Municipal Code Section 402.4 states in part:

"(a) The director of buildings and inspections shall have the power, upon application, to authorize variances from the provisions and requirements of this zoning code which will not be contrary to the public interest or the intent and purpose of this zoning code, but only where, owing to special conditions pertaining to a specific piece of property, the strict application of the provisions or requirements of this zoning code would cause undue or unnecessary hardship. The director of buildings and inspections shall not have the power to grant a variance which would permit a use contrary to the use regulations of the applicable zoning district."

[5] Cincinnati Municipal Code Section 405.2 grants a right of appeal to the zoning board of appeals from the denial of a request for a variance; the board is empowered to reverse, affirm or modify such a denial only in conformity with the provisions of the zoning code.

[6] The city's counsel's statements were part of the following colloquies:

"MR. CHESLEY [counsel for plaintiffs]: This court is sitting in equity. The Court sitting in equity is given broad powers. And no reasonable mind could conclude that the City would give a variance. One: We have the absolute turndown by Karches.

"THE COURT: Let's address — let's put the donkey in front of the cart.

"MR. RYDER [counsel for defendant]: The City I believe would not grant a variance on the request.

"* * *

"THE COURT: You made it clear that there won't be any variance.

"MR. RYDER: In my professional judgment they don't have any chance.

"THE COURT: I think what we have got here is an issue you have already indicated there is no way the City of Cincinnati would change its zoning to a[n] RF-1, correct?

"MR. RYDER: That we would not grant a variance.

"THE COURT: That zone period it is going to be there.

"MR. RYDER: The zoning is RF-1 and there is —

"THE COURT: And it is going to stay RF-1 no matter how many applications for variance or change of zones the property put[s] in. You have already indicated that.

"MR. RYDER: That's correct."

ercise our discretion and make the determination of constitutionality. See *Elio* v. *Akron Transp. Co.* (1947), 147 Ohio St. 363, 34 O.O. 301, 71 N.E. 2d 707.

To strike a zoning ordinance on constitutional grounds appellants must demonstrate, beyond fair debate,[7] that the zoning classification is unreasonable and not necessary to the health, safety and welfare of the municipality. *Mayfield-Dorsh, Inc.* v. *South Euclid* (1981), 68 Ohio St. 2d 156, 22 O.O. 3d 388, 429 N.E. 2d 159. See, also, *Euclid* v. *Ambler Realty Co.* (1926), 272 U.S. 365, 395; *Goldblatt* v. *Hempstead* (1962), 369 U.S. 590. Appellants must demonstrate that the ordinance denies to them the economically viable use of their land without substantially advancing a legitimate government interest. *Superior Uptown, supra*; *Agins, supra*; *Penn Central Transp. Co.* v. *New York City* (1978), 438 U.S. 104. See, also, *Ruckelshaus* v. *Monsanto Co.* (1984), 467 U.S. 986.

The trial court found it beyond the reach of fair debate that the existing RF-1 zoning as applied to appellants' properties was unreasonable, arbitrary and confiscatory; had no substantial relation to the public health, safety or general welfare; and substantially in-

terfered with appellants' right to use their property in an economically feasible manner. In reviewing the court's judgment, we are guided by the principle that judgments supported by competent, credible evidence going to all the material elements of the case must not be reversed, as being against the manifest weight of the evidence, *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279, 8 O.O. 3d 261, 376 N.E. 2d 578. Every reasonable presumption must be made in favor of the judgment and the findings of facts. *Seasons Coal Co.* v. *Cleveland* (1984), 10 Ohio St. 3d 77, 10 OBR 408, 461 N.E. 2d 1273. Finally, if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment. *Seasons Coal Co., supra*; *Gates* v. *Bd. of Edn. of River Local School Dist.* (1967), 11 Ohio St. 2d 83, 40 O.O. 2d 91, 228 N.E. 2d 298; *Ross* v. *Ross* (1980), 64 Ohio St. 2d 203, 204, 18 O.O. 3d 414, 415, 414 N.E. 2d 426, 428.

The trial court found that none of the RF-1 uses was economically feasible,[8] and that the RF-1 classification, as applied to appellants' properties, did not substantially advance a legiti-

---

[7] The court of appeals, by way of *obiter dictum,* opined that appellants' burden of proof is to show, beyond a reasonable doubt, that the ordinance at issue is invalid. Although we have characterized the burden of proof both ways in zoning cases, see *Hilton* v. *Toledo* (1980), 62 Ohio St. 2d 394, 16 O.O. 3d 430, 405 N.E. 2d 1047 ("beyond a reasonable doubt"), our most recent pronouncement is that the ordinance must be proven invalid "beyond fair debate." Regardless of this inconsistency, we discern little difference in meaning between the two characterizations. ("Reasonable" is defined in Webster's New Collegiate Dictionary [1980], as "moderate, fair.")

[8] Principal uses now permitted under the RF-1 designation are set forth in Division 2901 of the Zoning Code and include: residential uses permitted by Chapter 12 in the R-3 two-family district; agricultural uses; institutional uses such as churches, cultural displays and public administration buildings; recreational uses such as golf courses, fishing lakes, parks, playfields, swimming pools, tennis courts, recreation centers, bicycle courses and other similar recreational facilities; public utility uses; commercial uses including marinas, restaurants and motels directly associated with a marina and ferry or excursion boat terminals; and railroad uses.

mate government interest. To test this finding, we will examine (1) the evidence of record regarding the three uses for appellants' properties which the city claims to be economically viable (residential, commercial, recreational vehicle park), (2) the trial court's finding that the zoning significantly decreased the value of the properties, and (3) the government interest claimed by the city in behalf of the zoning.

### Residential

Any permanent structure erected on floodplain property must be waterproofed or elevated to the sixty-five foot flood stage level. No living area is permitted within the floodplain level. Compliance with floodplain requirements dramatically increases the cost of construction. The trial court's finding that such costs preclude residential development of appellants' properties is supported by the record.

### Commercial

The city argues that marinas, restaurants and motels are commercially feasible uses for appellants' properties.

Both Karches and Flerlage tried to operate bank boat marinas on their properties but were forced to suspend operations because of costs. The current board of health regulations require a sanitary sewer hook-up at any marina which rents slips to seven or more boats. The cost of the hook-up for the Karches' property was $195,590 in 1977.

It is the general opinion of marina operators in the California area that private development of a basin marina is economically unfeasible today because costs for excavation, labor and construction materials preclude development of an income-producing operation. No evidence of record rebuts this opinion.

Restaurants and motels are not feasible because compliance with federal floodplain requirements is a prerequisite to this type of construction. Further, the area lacks a viable consumer base and no restaurants, hotel or motel chains are interested in development in the California area.

### Recreational Vehicle Park

When Karches petitioned for a zone change in 1977, the city opposed the change because it believed that a recreational vehicle ("RV") park was a feasible use. Karches secured a construction cost estimate for building such a park. The cost estimate was approximately $1,050,000 in 1977.

Karches submitted the estimate to the city planning commission. The commission was skeptical and contracted with QUEST Research Corporation to perform an independent cost analysis. QUEST found that an RV park was economically feasible at a total cost of approximately $399,950.

The QUEST analysis was grossly deficient. It violated the city's board of health regulations, failed to account for necessary repairs to a bridge on the property and underpriced various items. Had the report fairly considered these omissions its cost estimate would have been significantly higher.

The QUEST project director

---

Division 2902 lists the principal conditional uses permitted under RF-1 upon authorization by the Director of Buildings and Inspections and includes certain multi-family dwellings, recreational vehicle parks (with certain restrictions) and amusement parks. Cincinnati Municipal Code Chapter 29, RF-1 Riverfront (Recreational-Residential-Commercial).

stated that the intent of the RV park estimate was not to show absolute development costs or operating expenses, but *was intended to refute the appellants' report.* The record supports the trial court's finding that use of appellants' properties as a recreational vehicle park is economically unfeasible.

*Impact of Zoning on Property Values*

The parties presented evidence establishing the fair market value of the properties as zoned RF-1, to be between $5,000 and $14,000 an acre, and if zoned RF-2, to be between $19,000 and $35,000 an acre. From this the trial court concluded that the rezoning caused a significant decrease in the value of the properties.

*The City's Interests*

The trial court found that the city's stated goals of increasing new riverfront business development and foreign trade were not achieved by its RF-1 zoning scheme. To the contrary, the court found that the city increased the land available for park and public recreation use by one hundred forty-three percent as opposed to an eighty-five percent increase of acreage available for industry. In addition, the California Land Development Use Plan indicates that a publicly supported park, located on appellants' properties, was considered a high priority use. The city, nevertheless, has made no financial commitment to this proposed use or to any other of the plan's proposed recreational uses of the California area.

The city argued that it was protecting the health, safety and welfare of the California area by refusing to rezone the properties to allow river terminal operations. The trial court reached the opposite conclusion, finding substantial evidence that the city's potable water quality would not be adversely affected in the unlikely event of a barge spill or by the storage of aggregate material. The court noted that if appellants are permitted to operate terminals, their operation is subject to the control and regulations of numerous governmental agencies such as the Army Corps of Engineers and federal and state environmental protection agencies.

Nor does the city make a persuasive argument that use of the properties as river terminals will adversely affect the gas transmission line of Cincinnati Gas & Electric, the traffic situation or the noise level in the area or pleasure boat traffic on the river. Rather, the evidence demonstrates that the properties are ideally situated for the river terminal use.

We measure the constitutionality of the RF-1 zoning "not by what * * * [the city] says, or by what it intends, but by what it *does." San Diego Gas & Elec. Co., supra* (450 U.S.), at 653 (Brennan, J., dissenting). Here, the record supports the trial court's finding that the RF-1 zoning as applied to appellants' properties is unreasonable and does not substantially advance legitimate government interests. By refusing to rezone, the city has denied the appellants the beneficial use of their property. We affirm the trial court's holding that the RF-1 zoning as applied to appellants' properties is unconstitutional.

III

An additional question has been introduced by the recent decision of the United States Supreme Court in *First English Evangelical Lutheran Church, supra:* Whether the city owes damages to the appellants for the taking that occurred before the ordinance was invalidated.

In their complaint, appellants requested damages for the alleged taking

of their properties by the city. The trial court made no finding concerning damages and appellants failed to appeal the issue. Thus, we will not consider this claimed error. *Foran* v. *Fisher Foods, Inc.* (1985), 17 Ohio St. 3d 193, 17 OBR 430, 478 N.E. 2d 998; *Hoffman* v. *Staley* (1915), 92 Ohio St. 505, 112 N.E. 1084.

Accordingly, the judgment of the court of appeals is reversed and the decision by the trial court is reinstated.

*Judgment reversed.*

MOYER, C.J., SWEENEY, DOUGLAS and WRIGHT, JJ., concur.

LOCHER and HOLMES, JJ., dissent.

HOLMES, J., dissenting. I agree that the constitutionality of a zoning ordinance may be attacked both by way of appeal pursuant to R.C. Chapter 2506 and by a declaratory judgment action pursuant to R.C. Chapter 2721. I reluctantly agree that an actual controversy existed here to provide the jurisdiction for the trial court to have considered the constitutionality of the questioned ordinance and for the court of appeals to have reviewed such determination. However, I cannot agree with the conclusion reached by the trial court, and the majority here, and therefore must dissent.

As noted in the majority opinion, the properties of both Mr. and Mrs. Karches and Mr. and Mrs. Flerlage border the shoreline of the Ohio River. The Karches property lies just east of the I-275 bridge. It initially consisted of a fifteen-acre parcel when purchased by the Karcheses in 1965 for the sum of $20,000. Mr. Karches sold 2.33 acres to the state of Ohio for use as a bridge approach to I-275, the consideration for such taking being

$19,200. In addition, an easement was taken by the state for the relocation of a gas line, for which the Karcheses received $6,300.

The Flerlage property lies immediately west of I-275. This property as acquired by the Flerlages in 1961 included thirty-six acres and cost $25,000. The state acquired nine acres of this property for the construction of an approach to I-275, and paid the Flerlages $102,072 for such taking.

It appears that both parcels were purchased by the respective parties for future investment potential, and without any personal or specific use in mind. It would appear that what has been realized from such property to date by the owners, together with significant acreage yet remaining in such parcels for sale or development, is a fair overall return on their investment. A similar return can be anticipated for future transactions.

More importantly, from the standpoint of determining the constitutionality of the instant zoning ordinance, we must look to the reasonableness of that which the city wished to accomplish by such zoning plan. The zoning plan being questioned here is not one of spot zoning or single tract zoning, but is intended to regain the entire twenty-two miles of Ohio riverfront property—the whole river corridor through downtown and metropolitan Cincinnati.

The "California" area is an older residential and recreational neighborhood. It has eighty-five single-family and sixteen two-family homes. The prevalent architectural styles are Federal, Romanesque, and Victorian. The only permitted uses other than residential and recreational in the vicinity are a few commercial establishments on Kellogg Avenue and the Cincinnati Water Works facility. All properties in the area from the Little Miami River,

east to the city corporation line, fronting on the Ohio River are zoned RF-1, Riverfront (recreational-residential-commercial). Even though the present uses of these properties were established prior to the passage of the new RF-1 regulations, *all* are conforming uses.

The California neighborhood has many existing recreational establishments. Collectively they annually draw more than one and one-half million people, more than any other attraction in the metropolitan area except Kings Island. The single largest draw is River Downs, a thoroughbred horse racing track. It has an annual attendance of over five hundred thousand people. Coney Island, which abuts the eastern side of the Karcheses' property, celebrated its centennial in 1986. Every year more than three hundred thousand visitors use its many other recreational facilities: Lake Como, Sunlite Pool (the world's largest outdoor recirculating swimming pool), tennis courts, Moonlite Pavilion, picnic grounds and ball fields, restaurants, the Cincinnati Rowing Club's Olympic training facility, a landing for river party boats, and a fairground. Coney Island is the annual site of the Summer Fair, the Art Show, the Balloon Fair, the Outdoor Sports Recreation Exhibit, and the Appalachian Crafts Festival.

The Cincinnati Symphony Orchestra's summer home, Riverbend, lies between Coney Island and River Downs. Its estimated draw for 1985 was four hundred thousand visitors. Riverstar Park abuts the Flerlage property to the north. It has heavily used baseball fields and a BMX dirt bike track, which in 1985 had over one hundred fifty thousand users. Three bank boat harbors are located along the California waterfront, just west of the Flerlage property. Harbor Towne Yacht Club, a nearby basin marina, is upriver from the mouth of the Little Miami River.

Other recreational facilities in the area include the California Nature Preserve and Day Camp, the California Golf Course, Four Seasons Marina, a fishing lake, and a soccer field. The entire riverfront area from Four Seasons Marina to River Downs is devoted to recreational and residential use and is zoned to allow such uses. *There are no industrial uses anywhere in the area.*

The determination by the city to zone the river corridor RF-1 to provide for recreational and outdoor activities including enjoyment of the natural resources was not the product of an overnight decision, but was derived from a protracted period of professional consideration and review of the waterfront development.

In 1975, the Cincinnati City Manager appointed the Riverfront Advisory Council as the city's official advisory body for the future development of the entire Cincinnati riverfront. The twenty-two-member group studied the twenty-two miles of the Ohio River frontage and twenty-three hundred acres between the Ohio River and U.S. Routes 50 and 52. In late 1981, after six years of joint effort, the advisory council and the city planning commission jointly published "A Study of the Cincinnati Riverfront." This was their plan to promote economic development, stabilize riverfront neighborhoods, and enhance overall livability. In January 1982, city council adopted the "Study" as the city's official plan. The Study's Land Use Plan made specific zoning recommendations for thirty-one separate riverfront areas. Overall, it recommended designating eight hundred forty acres for industry, two hundred seventy-six acres for commercial-recreation, six hundred

acres for parks and public recreation, and one hundred fifty-two acres for residential use. It proposed the development and conservation of seven hundred thirty-one acres then vacant.

In addition to the broad study of the entire Cincinnati riverfront, the Cincinnati City Planning Commission looked quite carefully at the California neighborhood in order to determine what zoning to recommend for that area. The product of the commission's research was the "California Land Development Use Plan" dated October 6, 1978. The plan's authors found:

"In sum, it is concluded that pursuit of a recreation theme will have the greatest public and private effects, in terms of positive economic benefits from both governmental and individual developments. Except for the very long term (and perhaps not even then), no potential industrial investment can realistically expect to exceed the return on recreational development as a dominant land use in the California community as a whole. A switch to industrial use on some land will not cause other land to be so absorbed immediately. It will, most probably, cause prolonged idling of some land, deter recreationally related development, and discourage the maintenance of some existing investments. The sum of effects for all land owners within the study area will certainly be negative. Given the over-spill of adverse effects which industry would also create, especially in terms of environmental impact on the existing community, recreational/residential use of land in the California area becomes a far superior alternative."

There were additional studies showing the potential for the California area as basically recreational. The "California Economic Base and Market Potential Study" by Public Demographics, Inc. demonstrated the recreational market for the California area from the Little Miami River to River Downs. This study, completed July 17, 1985, was underwritten by the Cincinnati Department of Neighborhood Housing and Conservation to further the revitalization of both the California neighborhood and the larger Cincinnati economy.

The authors of the study examined River Downs Race Track, Riverbend, Coney Island, Riverstar Ballpark, the California Golf Course, the Nature Preserve, the marinas currently operating on the Little Miami and Ohio Rivers, the Bicycle Moto Cross Track (BMX) and the California neighborhood and business district. The Karches and Flerlage properties were also mentioned. In 1984, the California recreational area attendance exceeded the attendance for the Cincinnati Reds, the Coliseum or the Cincinnati Zoo. Kings Island was the only attraction in the Cincinnati metropolitan area to top the 1984 California recreational area attendance. Projections for 1985 indicated a 15.6 percent increase to 1,547,949 users. The market potential study included the finding that the drawing power, waterfront location, rustic setting, proximity to the downtown area, and concentration of several major recreational attractions distinguished California from any other community in the region.

Accordingly, the city council, on June 27, 1984, passed Ordinance Nos. 257-1984, 258-1984, 259-1984, and 261-1984 to enact RF-1, RF-2, and RF-3 district use regulations as three new chapters of the city zoning code and to adopt new boundaries for all the RF districts along the entire Cincinnati riverfront. The new regulations were entirely consistent with the Riverfront Advisory Council's recommendations as set forth in the "Study of the Cincinnati Riverfront." RF-1 permits river-

front recreational, residential, and certain commercial uses. RF-2 allows a number of commercial and industrial uses, including limited river terminals. RF-3 permits river-oriented heavy industry.

As set forth in Ordinance No. 261-1984, which established Chapter 29, the RF-1 Riverfront (Recreational-Residential-Commercial) District Use Regulations, "[t]he purpose of the RF-1 Riverfront District Use Regulations is to regulate the use of floodplain land along the Ohio and Little Miami Rivers so to:

"(a) Promote those residential and river-related recreational and commercial activities which meet the requirements imposed by Chapter 1156, Floodplain Management, of the Cincinnati — Ohio Basic Building Code;

"(b) Maintain scenic river view from major public thoroughfares;

"(c) Preserve open space while permitting recreational, residential, and commercial activities that either require direct river access or otherwise benefit from the river environment;

"(d) Preserve significant natural features of the floodplain environment;

"(e) Contribute to the stability and revitalization of adjoining neighborhoods * * *."

Additionally, the principal permitted uses in an RF-1 district include residential uses, agricultural uses, recreational uses, commercial uses, and marine uses. In this latter category, all manner of business uses exist such as for harbors, marinas, launching ramps, docking facilities; eating, drinking and entertainment establishments, boatels and hotels or motels directly associated with a marina; enclosed facilities for the sale, service or storage of recreational boats and recreational marine supplies; or ferry or excursion boat terminals.

The ordinance provided also for a rather broad number of conditional uses which may be authorized by the Director of Buildings and Inspections pursuant to Section 402.2 of the ordinance. Some of these are residential uses, such as hotels and motels, multi-family dwellings and/or planned unit developments. There are also various permitted uses which would be categorized under agricultural, recreational, recreational vehicle parks, amusement parks, and offices.

In review of the determination of either the Ohio General Assembly or a city council in any matter of a state or local concern in adopting a statute or ordinance which may conceivably conflict with an individual's rights to reasonably utilize private property, we must first look to and apply the legal standards which best serve the public as a whole. The determination of whether there has been a proper exercise of this governmental authority must equate to what is, after such evaluation, best for the general public welfare.

It is fundamental that Acts of the General Assembly and ordinances of municipalities are presumed to be constitutional, and the burden is upon those challenging such laws, as appellants in the instant case, to sustain such challenge. The Act or ordinance in order to be found constitutionally invalid must be found *facially* to be against a constitutional provision, or must be found to be unreasonable or arbitrary as it relates to the complaining party. The evidence of unreasonableness or arbitrariness must be clearly and satisfactorily shown. As recognized by the majority herein, to strike a zoning ordinance on constitutional grounds the complaining parties must demonstrate beyond fair debate that the zoning classification is unreasonable, and not necessary to the health, safety and welfare of the com-

munity. Further, the complainants must demonstrate that the ordinance denies them the economically viable use of their land without substantially advancing a legitimate government interest. Apparently the trial court so found, and with this finding I disagree.

Much is made in the trial court's opinion, bearing on the issue of disparity of treatment of landowners, of the fact that the Taft investment group opposed any zoning classification sought by appellants. The trial court even went so far as to find that Taft's motives were to keep appellants' properties so classified in order to purchase them at a cheaper price, and that the city gave discriminatory treatment to Taft. Most obvious, upon the facts, is that this conclusion is erroneous and, further, has little if any relevance to the inquiry at issue. Admitting that Taft engaged in activities to keep the property at issue within the RF-1 classification, and for the express purpose of gaining its own economic advantage, it can only be concluded that nothing is added to the analysis of whether a taking occurred. Such activities are, first of all, fully lawful and reasonable. It is part of the ordinary political process by which the needs, interests and opinions of the community are focused into a particular determination. Moreover, the zoning authority uniformly applied the RF-1 zoning classification, with the exception of Old Coney, and stated completely neutral reasons for doing so.

As to Old Coney, owned by Taft, it cannot be denied that its amusement park operation did not qualify for an RF-1 classification but was in use prior to adoption of the 1963 zoning change. Under any theory, Taft would have been entitled to continue its activities, which, coupled with the fact that an amusement park fits quite well with recreational themes, fully refutes the notion that there was disparate treatment. Appellants, on the other hand, have continually sought to bring in truly industrial uses which were entirely inconsistent with the themes adopted by the zoning authority. Thus, while the considerations of Taft's expressed position on the zoning added nothing to the inquiry, reliance upon a finding of discrimination as their basis was both unsupported as well as an improper. basis for concluding that a "taking" of property had occurred.

Governmental bodies throughout our country are becoming more aware of the potential for the development of our natural resources in general, and in particular, for the land and property that abuts and surrounds our water resources, lakes and rivers. Municipalities recognizing the tremendous increases in use of water resources by the American people for active recreational, passive recreational, and natural resource study purposes, and for aesthetic enjoyment, are developing public participation programs and enacting zoning ordinances to provide a greater public utilization of such areas.

The Cincinnati City Council, as have the other major municipal legislative bodies of communities in Ohio bordering on bodies of water, such as Toledo, Columbus, Cleveland, and Dayton, has formulated long-range plans for the utilization of these waters. These plans and developmental recreational programs are based solidly upon the total growth of the community and should be given due deference by this court. Such plans are, of course, intended for the total public advantage, although in certain instances this programmed use admittedly may occasion some disadvantage to an individual property owner. A mere disadvantage, however, does not rise to the level of a taking.

There are, as set forth within this zoning ordinance, many other reasonable uses for which these property owners may advantageously utilize their property, other than by selling it for a gravel storage and loading operation. It is therefore simply not believable that there are no other uses, within the options allowed by the zoning ordinances, for which this property may be utilized. Appellants' argument is a mere personal preference among several commercial options.

Moreover, there was no showing that the ordinance was either unreasonable or discriminatory, or that the zoning classification was not necessary to the health, safety and welfare of Cincinnati. As a matter of fact, the use contemplated by appellants would have a direct negative impact upon the entire community. There would be an explosion of heavy duty truck traffic which would be required to move the material from the barges. These slower vehicles would, of necessity, interfere with the already heavy flow of traffic on Kellogg Avenue. Further, such trucks would be required to travel through surrounding residential communities upon streets not constructed for such vehicles. Finally, the community and visiting recreational users would become burdened with the great volume of dust particles that ordinarily accompanies the movement of large amounts of sand and gravel. To say the least, such incidental effects would constitute a nuisance.

I would prefer that this matter be remanded to the court of appeals to review upon appeal the issue of the constitutionality of this ordinance under the facts presented, but if this court is determined to decide that issue here, although it has not been fully developed, I would reverse the trial court's judgment which holds the Cincinnati RF-1 zoning ordinance unconstitutional, and enter judgment for the city of Cincinnati holding that this questioned ordinance is indeed constitutional.

Accordingly, I dissent.

LOCHER, J., concurs in the foregoing dissenting opinion.

# Appendix A

APPENDIX A

Composite Maps from "A Study of the Cincinnati Riverfront" (S.R. Vol. IV, 440, 444, 454, 456)

City Planning Commission
Cincinnati, Ohio
October, 1981

380 Meters

0    400    800    1200 feet