DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Lucille and Earl Beggs (the "Beggs"), appeal from the judgment of the Wayne County Court of Common Pleas, that found in favor of Appellees, Kay and Terry Shue (the "Shues"), pursuant to a favorable jury verdict. We affirm.
 I. {¶ 2} The Beggs are owners of a residence and surrounding grounds located at 4005 Sommers Road, in the Township of Sugarcreek, Ohio, in Wayne County, which they purchased in 1994. The Beggs constructed a home on the property with a detached garage in 1996. The Shues own and reside at 4000 Steinwood Drive in Sugarcreek, an adjacent property located southwest of and directly uphill from the Beggs' property. The Shues have lived there since 1997.
 {¶ 3} These properties had been used as farmland by the family of Clayton Steiner, d.b.a. Steinwood Allotments. Steiner later developed the land and sold these lots to the parties. Contained in the restrictions attached to the Beggs' deed is a provision noting that the lots are surrounded by "a farming community with farms and farming operations being carried on all sides of said allotment with the normal noises, odors, and run-off from said operations." The restrictions also noted that lots 27 and 28 in the allotment, located nearby the Beggs' and the Shues' property, were maintained as an open drainage area constructed to handle "surface runoff," and were identified as a Drainage Easement, which acted as a ditch to where water could flow. No drainage easements are known to exist on either the Beggs' or the Shues' property.
 {¶ 4} In December 1999, the Shues built a pond on their property. The pond measured approximately 44 feet by 22 feet, with a depth of four feet, and was located directly west and up the slope from the Beggs' house. The Shues installed an overflow pipe which faced the Beggs' property, and which took excess water from the pond and deposited it on the Shues' property.
 {¶ 5} In January 2000, the area had a large rainfall. The water from the rainfall overfilled the pond, and subsequently the pond began to leak, its water level dropping about eight inches in two weeks. It was discovered that a plug in a drain tile located under the pond released, which caused water to drain into the field tile and head downhill through the Beggs' property by their garage. The Beggs asserted that their sump pump began to run continuously about one month later. They also maintained that due to this water flow, they began to experience wetness and mold in their basement as well as cracks in their driveway, cement and foundation of the residence and detached garage, and that they incurred numerous expenses from repainting and replacing their sump pump and flooring.
 {¶ 6} In September 2000, the Beggs filed a complaint against the Shues[1] asserting negligence in the construction and maintenance of the pond, and trespass. In February 2001, the Beggs dismissed the complaint without prejudice.
 {¶ 7} On February 13, 2002, the Beggs refiled their complaint with the addition of Steiner and his wife, Ruth Steiner, as well as unnamed John Does, as defendants. The Beggs asserted a breach of warranties claim, stating that the Steiner's had failed to disclose the existence of substantial lines of farm field tiles on their property and that these tiles caused excessive run-off water to flow onto their premises. On September 23, 2003, the Steiner's filed a motion for summary judgment. The court granted the motion, finding in favor of the Steiner's on the Beggs' claims.
 {¶ 8} On November 15, 2002, the Beggs filed a motion in limine to prevent the admission of certain information, to wit, 1) the Beggs' assertions that Terry Shue had brandished a gun towards them, and 2) evidence of emails sent to Terry Shue by the Beggs' expert witness, John Fenton, regarding settlement of the case. The Beggs asserted that this information would be highly prejudicial and would only confuse and mislead the jury. The court timely denied the motion.
 {¶ 9} The matter proceeded to a three-day jury trial, pursuant to which the jury returned a unanimous verdict in favor of the Shues. This verdict was supported by the jury's unanimous interrogatory answers indicating that the Beggs had failed to prove that the construction and/or maintenance of the pond caused any damage to the Beggs' premises or their residence, and that, therefore, the Shues were not negligent. The court journalized the verdict and entered judgment in favor of the Shues. This appeal followed.
 {¶ 10} The Beggs timely appealed, asserting two assignments of error for review.
 II. A. First Assignment of Error
"The jury's verdict in favor of defendants (appellees) is against the manifest weight of the evidence."
 {¶ 11} In their first assignment of error, the Beggs assert that the jury's verdict finding in favor of the Shues was against the manifest weight of the evidence. We disagree.
 {¶ 12} Initially, we note the appropriate standard of review. When the manifest weight of the evidence is challenged, "[a]n appellate court conducts the same manifest weight analysis in both criminal and civil cases." Ray v. Vansickle (Oct. 14, 1998), 9th Dist. Nos. 97CA006897 
97CA006907, at 3.
"The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the [verdict] must be reversed and a new trial ordered." State v. Thompkins (1997),78 Ohio St.3d 380, 387, quoting State v. Martin (1983),20 Ohio App.3d 172, 175.
 {¶ 13} This action is preserved for the exceptional circumstance where the evidence presented weighs heavily in favor of the party opposing the verdict and judgment. State v. Otten (1986), 33 Ohio App.3d 339, 340.
 {¶ 14} An appellate court that overturns a judgment as against the manifest weight of the evidence acts in effect as a "thirteenth juror," setting aside the trier of fact's resolution of the testimony and evidence. Thompkins, 78 Ohio St.3d at 387. Every reasonable presumption must be made in favor of the judgment and the findings of fact of the trial court. Karches v. Cincinnati (1988), 38 Ohio St.3d 12, 19.
 {¶ 15} Moreover, a judgment is not against the manifest weight of the evidence simply because conflicting evidence exists before trier of fact. State v. Haydon (Dec. 22, 1999), 9th Dist. No. 19094, at 14. "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the trial court's verdict and judgment." Karches, 38 Ohio St.3d at 19. This is so because evaluating evidence and assessing credibility are primarily for the trier of fact.Hoitt v. Sieffer (1995), 105 Ohio App.3d 104, 107; State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 16} In this case, the jury found in favor of the Shues on the Beggs' claims. The jury's answers to interrogatories reveal that the jury unanimously could not find, by the greater weight of the evidence, 1) that the Shues' construction of the pond proximately caused any amount of damage to the Beggs' premises, 2) that the construction caused run-off water to commit trespass on the premises, and 3) that the Shues were negligent.
 {¶ 17} Testimony was presented at trial that characterized the water in question as both surface and subsurface water. During trial, counsel for the parties and the court deliberated over this issue, and the court ultimately decided that because of the peculiar nature of this water, that an instruction on negligence as well as trespass were both appropriate. See, generally, McGlashan v. Spade Rockledge Terrace CondoDev. Corp. (1980), 62 Ohio St.2d 55 (stating that Ohio applies the reasonable use rule for surface water disputes and a defendant's liability for interference with surface water flow is controlled by principles of common-law negligence, regardless of whether the plaintiff's cause of action sounds in nuisance or trespass); Guarino v. Farinacci,
11th Dist. No. 2001-L-158, 2003-Ohio-5980 (involving a trespass claim against the city).
 {¶ 18} On a negligence claim, a plaintiff must show that the defendant breached a duty of care owed by him, and that the breach of this duty was the direct and proximate cause of the plaintiff's injuries. Horrisbergerv. Mohlmaster (1995), 102 Ohio App.3d 494, 498. Trespass is defined as "the unlawful entry upon the property of another." Guarino at ¶ 12. To establish trespass, a plaintiff must establish an unauthorized intentional act and entry upon land in the possession of another. Id.
 {¶ 19} The Beggs assert that the Shues breached their duty to act reasonably, and that the pond must be the cause of their property damage because it was only after the Shues had installed the pond that they started to experience problems. The Beggs themselves offered inconsistent testimony as to when they began to experience problems. In particular, Lucille Beggs testified that they first experienced problems in late spring or summer of 2000. The Beggs then testified that they began to experience problems in January 2000. In either event, they insist that they did not experience any water problems prior to the Shues' construction of the pond, and that they did not notice any field tiles during the excavation for the construction of their home which might have broken and led to any subsequent water problems.
 {¶ 20} Steiner testified on behalf of the Shues regarding the nature and use of the land prior to its residential development. Steiner stated that his father had owned the land, and that he grew up on the land while it was used for farming purposes. Steiner also testified that he recalled the clay tile drainage system being laid on the property. Additionally, he stated that he was present at times during the construction of the Beggs' home. He testified that he recalled seeing field tile being cut during the excavation for the basement.
 {¶ 21} Terry Shue testified that he talked with the Beggs before constructing the pond, to see their opinion on it. He stated that initially, the Beggs did not seem upset with the idea, and even welcomed it. Terry recalled part of his conversation with Earl Beggs at the time:
"[He] talked to me about water problems that he was having in his barn [i.e., detached garage] and wanted to know if he could bring a pipe over from his down spout on his barn to bring it over to the pond to fill the pond up. That would be good for the pond and it would get water away from his barn that was hurting his barn in his words."
 {¶ 22} However, Terry noted that after this conversation, the Beggs started to show concern over the construction of the pond and what effect it would have on the water flow onto their property. Terry further testified that during the excavation for the pond, he discovered that there were field tiles underground, and that one four-inch clay field tile was broken by the excavation. Terry testified that per the advice of Larry Orr from Orr Construction, Incorporated, he filled each end of the field tile with secrete, a concrete type of substance, to plug the tile, and then reconnected the severed tiles. He further stated that he put in sand and a liner into the pond to eliminate cattails.
 {¶ 23} Greg Piatt, sole owner of Piatt Excavating, a residential excavating company, testified on behalf of the Shues about his visit with the Beggs in 2000. The Beggs had contacted him to give an estimate on the water damage in their basement. Piatt testified that he did not ultimately provide an estimate because further investigation was necessary. However, he did testify that the Beggs informed him that they had experienced water problems in the basement during the construction of the home; furthermore, he understood that the Beggs had to replace some sump pumps prior to the pond being constructed. The Beggs had also shown Piatt pictures of the construction of their home, which indicated that tile lines were in fact cut during the excavation of the basement. Piatt explained that the Beggs told him that the general contractor had to come back to dig up the foundation, and that they had to re-waterproof part of the basement wall that faced west, towards the Shues' property.
 {¶ 24} John Fenton, a registered professional engineer and friend of the Beggs, testified at trial. Fenton stated that he was contacted by the Beggs in 2000 to assess the water problems they began to experience after the Shues built their pond. He noted that the Beggs stated to him that they had not experienced any problems prior to that time. In his assessment of the Beggs' water problem, Fenton stated that the problem "dealt more with the type [of] canfield soils and what happens in those soils" than the emptying of the pond on that rainy night. Fenton explained that when the pond was dug, it was dug through a 20 to 30-inch layer and came in contact with the fragipan, a denser layer of soil. Instead of the water slowly seeping down through the soil, he testified that it went directly to the fragipan level, which he asserts carried the water to the Beggs' property. He explained, that, as long as the pond was filled with some water, that water would theoretically have drained to the Beggs' property from the outset; he explained that the heavy rain in January would have only aggravated that already existing condition.
 {¶ 25} Fenton noted that because of the drainage swale[2] located in the Beggs' backyard, any surface water would not come to their house. However, he ultimately did conclude that the Beggs' property was affected by the construction of the pond, and that he believed that the construction of the pond proximately caused the Beggs' water problems. Fenton reasoned that the pond had disrupted both the natural flow and the drain tile flow in that area.
 {¶ 26} Larry Orr testified that he was contacted by Steiner and Terry Shue in March 2000 to address the problem involving the Beggs' and the Shues' property. After investigation, Orr discovered broken tiles on another neighbor's property. Orr followed the broken tile and determined that there was an underground drainage system covering several properties, including that of the Beggs. Orr testified that he discovered a main field tile line that originated on this neighbor's property, ran uphill towards the Beggs' and the Shues' property; this line headed specifically towards the Beggs' house and either went directly through their basement or right near the basement. Orr noticed "blow holes" in the land where tile had been disturbed either by a contractor or by construction of the homes. Orr testified that he also discovered a tile line going through the Shues' pond that would have been connected to the overall system, and which was disrupted by the pond construction. It was at this time that the Beggs informed Orr that they had been experiencing water problems in their basement and that they believed the Shues' pond to be the source of the problems.
 {¶ 27} Based on his experience in excavation and installation of drainage systems, Orr testified that the drainage system was installed for use as farmland. He further testified that when property is changed from a farm field to a residential allotment, most of the field tiles get damaged or interrupted by severing of the lines to put in a basement, septic system, or utility line, for example. Orr noted that it depends on the specific building contractor as to whether the situation is remedied to maintain the integrity of the system. Orr compiled a written report in spring 2000, accompanied by a four-page summary of information. In his summary of information, Orr stated, "I am not convinced that [the] Shues' pond is causing Beggs sump pump to run when it rains. I think it is other field tile on the vacant lot south of Shue's," on which is located a tile system that flows onto the Beggs' property. Additionally he noted that "[t]here is a great potential" that a utility trench dug on the Beggs' property cut one or more tile lines, and that the line may not have been reconnected properly. It is important to note that Fenton confirmed that the utility trench could have disrupted the field drainage system. Orr also asserted that the Beggs' house is located in the middle of a drainage swale where a five-inch clay main line is probably located. Finally, Orr explained that the type of soil on the Beggs' lots has perched water tables, which could be another reason their sump pump ran frequently.
 {¶ 28} Orr testified that he and Fenton were called in 2002 to further investigate the cause of the Beggs' water problems together. He stated that they were not able to determine the cause of the problems at that time. In a letter to John Fenton dated April 7, 2003, Orr expressed his conclusions and reasoning as follows:
"It could not be proven that the pond on Terry Shue's property did or did not cause water in Mr. [and] Mrs. Beggs' basement. It may only be a coincidence that the wet basement problem began at the time the pond was constructed.
"The tile cut during the pond construction should not have caused water to be sent directly to [the] Beggs' basement. There was no tile cut off by the basement excavation so there is no way for water to be forced into the basement from the field tile. Beggs' basement is down slope from the property to the West. Water will travel down slope in a canfield soil. Pictures taken during Beggs' basement excavation showed sod and topsoil being covered by fill from the basement. Water can be traveling though the decaying sod and topsoil toward the basement walls simply because the basement is located down slope. This decaying residue may be causing the wet basement. There was some wetness noted during the construction. The builder addressed this with extra gravel during basement backfill."
Orr explained that the Shues' creation of the pond would not impact the water coming through the topsoil to the Beggs' basement. Orr also explained that he did not believe that the pond was causing any current problems the Beggs may be having with their basement. He reasoned that the Shues' placement of a liner would prevent any water from leaking, and in the event that water may leak, the water would not naturally flow towards the Beggs' house, but instead would flow towards their garage, following the contours of the land.
 {¶ 29} The agreed facts of Orr and Fenton state that the Beggs said that their basement was dry before the Shues put in their pond, and that no tiles were cut during the Beggs' excavation for the foundation of their house. Orr and Fenton did agree themselves, based on their interview of the builder of the Beggs' home and pictures taken by the Beggs during construction, that no tile had been cut in the excavation of the Beggs' house. However, Orr noted that no one knew the exact location of the main underground field tiles, the lateral lines that go to them, or workability of these lines, and furthermore, that it was possible that the system was experiencing other leaks of which no one had direct knowledge. In addition, Orr admitted that because of these unknown issues no one specifically knew how these factors affected the direction of the water flowing; in other words, no one could determine whether the water was being directed more towards the Beggs' property or other neighbors' properties, if at all.
 {¶ 30} Fenton also admitted that he and Orr did not have enough information to determine the full extent of the tile layout. No one could say with complete certainty whether there was field tile in the area of the Beggs' property where they had dug a utility trench, from the lower left corner of their property to their house, or whether the digging of the trench disrupted any field tiles. Furthermore, Steiner testified that he personally observed at least two field tiles that were broken during the excavation of the Beggs' basement, and stated that more tiles may have been broken.
 {¶ 31} Based upon a careful review of the record, we find that the jury in this case did not create a manifest miscarriage of justice when it found in favor of the Shues. See Thompkins, 78 Ohio St.3d at 387;Martin, 20 Ohio App.3d at 175. We cannot say that the evidence presented weighs heavily in favor of the Beggs as to warrant a reversal. See Otten, 33 Ohio App.3d at 340.
 {¶ 32} The Beggs articulate several arguments that essentially challenge the credibility of the testimony presented at trial, asserting that the jury's responses to the interrogatories did not reflect the manifest weight of the evidence. They claim that these responses resulted from the jury being prejudiced and inflamed by irrelevant factors brought out at trial, namely, the fact that Terry Shue is a Mennonite minister. The Beggs also suggest that Steiner did not wish for Orr to divulge the source of the water problem, asserting that Steiner was unwilling to hire an expert that would point fingers at the pastor of a church to which he belongs. Additionally, the Beggs assert that the jury failed to give Fenton's testimony appropriate consideration. Notably, the Beggs do not explicitly state that the Shues' experts were not qualified, but appear to maintain merely that their expert was better qualified.
 {¶ 33} While Fenton is a registered civil engineer, Orr had been in the excavation business for about 35 years, and attends an annual seminar on the topic of ponds. Interestingly, even Fenton testified on the stand that Orr had very good experience and would have the experience and some training to design waterways.
 {¶ 34} As the finder of fact in this case, the jury was required to weigh the credibility of the witnesses and their testimony, as this role rests primarily with the finder of fact. See Hoitt,105 Ohio App.3d at 107; DeHass, 10 Ohio St.2d at paragraph one of the syllabus. As such, this Court cannot fault the jury's decision to place more emphasis on testimony of the Shues' witnesses. We are reluctant to usurp the jury's verdict in this case, and must adhere to giving the evidence and testimony that interpretation which is consistent with the verdict and judgment. See Karches, 38 Ohio St.3d at 19. Furthermore, we reiterate that a verdict is not against the manifest weight of the evidence simply because they jury was presented with conflicting evidence. Haydon, supra, at 19.
 {¶ 35} Therefore, we conclude that the jury verdict in this case was not against the manifest weight of the evidence. Accordingly, the Beggs' first assignment of error is overruled.
 B. Second Assignment of Error
"The court abused its discretion in overruling plaintiffs-appellants' motion in limine regarding alleged irrelevant material outside the scope of plaintiffs-appellants' pleadings, i.e., that appellees had brandished a gun, shot fireworks at appellants as well as permitting testimony on plaintiffs-appellants' expert independently e-mailing remarks concerning the settlement of proceedings and impropriety of defendants-appellees, which entire probative value was substantially outweighed by the danger of undue prejudice, confusion of the issues and misleading of the jury."
 {¶ 36} In their second assignment of error, the Beggs assert that the trial court erred in denying their motion in limine to exclude certain anticipated testimony from the Beggs themselves regarding certain allegedly threatening behavior of Terry Shue, as well as testimony from John Fenton regarding emails he sent to the Mennonite Church in an attempt to settle the case, which they asserted would "cast a religious taint and prejudice on the proceedings and the expert, which would most likely inflame and divert the jury from the issues at hand[.]"
 {¶ 37} The Beggs reference arguments they made in their motion in limine. Specifically, the Beggs appear to argue that this evidence is not relevant to the real issues at hand, and furthermore, that the evidence is not admissible as being unfairly prejudicial, and would lead to the confusion of issues and misleading of the jury. On appeal, the Beggs argue generally that the question of Terry Shue brandishing a gun and personal insult in emails regarding a Mennonite pastor, in light of the large Mennonite population in Wayne County, would "most likely cast a religious taint on the entire proceeding." The Beggs also reference their counsel's specific objection at trial, that the Beggs did not authorize their expert to send these emails. The Shues respond that it was within the trial court's broad discretion in allowing their counsel to introduce evidence to impeach the credibility of Fenton. They assert that the evidence of the Beggs' statements regarding the gun, fireworks, and alleged harassment and vandalism, and Fenton's status as a friend of the Beggs, was relevant and admissible to impeach their credibility as witnesses. Specifically, the Shues maintain that the statements of the Beggs indicate to what great lengths they would go to influence their expert's opinion; and that Fenton's relationship to the Beggs indicated prejudice and bias.
 {¶ 38} The admission or exclusion of relevant evidence is within the sound discretion of the trial court. State v. Sage (1987),31 Ohio St.3d 173, paragraph two of the syllabus. Furthermore, whether the probative value of evidence is substantially outweighed by any prejudice to a party is also a matter left to the sound discretion of the trial court. State v. Iacona (Mar. 15, 2000), 9th Dist. No. 2891-M, at 39, citing State v. Allen (1995), 73 Ohio St.3d 626, 633. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency." Pons v. Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621. This Court will not reverse an evidentiary ruling unless the trial court has abused its discretion and a party has suffered material prejudice from that ruling. Weiner, Orkin, Abbate Suit Co., L.P.A. v. Nutter
(1992), 84 Ohio App.3d 582, 589.
 {¶ 39} The scope of cross-examination encompasses all relevant matters affecting credibility. Evid.R. 611(B). Pursuant to Evid.R. 607, a party may attack the credibility of a witness. See State v. Hoehn, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, at ¶ 30. Additionally, Evid.R. 616 allows a witness to be impeached by showing bias, prejudice, interest, and by showing facts that contradict a witness' testimony. State v.Eagle, 9th Dist. No. 04CA0003, 2004-Ohio-3255, at ¶ 36.
 {¶ 40} First, we note that the Beggs assign as error the trial court's ruling on their motion in limine. A ruling on a motion in limine is an interlocutory ruling as to the potential admissibility of evidence at trial and cannot serve as the basis for reviewing error on appeal. Statev. Grubb (1986), 28 Ohio St.3d 199, 201-02. Since a ruling on a motion in limine is only preliminary, an objection to such evidence must be raised once the evidentiary issue is presented during trial in order to properly preserve the question for appeal and to avoid a waiver of such a challenge. State v. Maurer (1984), 15 Ohio St.3d 239, 259-60.
 {¶ 41} We also note that the emails that the Beggs claim were wrongfully admitted by the trial court, Exhibits five through seven, were actually withdrawn by the Shues' counsel after all the testimony had been taken. Therefore, the Beggs' preliminary assertion that this evidence was admitted is directly contradicted by the record.
 {¶ 42} The trial court did, however, allow defense counsel to question Fenton regarding these emails over the Beggs' counsel's objection, and thus questioned him about the Beggs' allegations that the Shues brandished a gun and shot fireworks towards the Beggs' property. However, it was the Beggs' counsel that induced this testimony when he first introduced evidence of Fenton's emails to the jury at trial, and specifically when he questioned Fenton about his unprofessional conduct on direct examination. Under the invited-error doctrine, a party will not be permitted to take advantage of an alleged error that the party invited or induced the trial court to make. State ex rel. Fowler v. Smith (1994),68 Ohio St.3d 357, 359. We do not address whether the trial court in fact erred in allowing the Beggs to testify about this information. However, we do find that the Beggs cannot now assert that the trial court allowed such testimony in when it was their counsel that induced this testimony in the first place.
 {¶ 43} As to Lucille Beggs' admission during cross-examination that they told Fenton of Terry Shues' purported harassing behavior, the Beggs have failed to demonstrate how they were materially prejudiced by this admission, in the light of the other evidence supporting the jury's verdict. See Weiner, Orkin, Abbate Suit Co., 84 Ohio App.3d at 589-90.
 {¶ 44} Based upon the foregoing, we find that the trial court's decision to allow this testimony from Fenton and the Beggs did not rise to the level of an abuse of discretion. See Pons, 66 Ohio St.3d at 621;Weiner, Orkin, Abbate Suit Co., 84 Ohio App.3d at 589-90. The Beggs' second assignment of error is overruled.
 III. {¶ 45} The Beggs' first and second assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellants.
Exceptions.
Whitmore, P.J. concurs.
Carr, J. concurs in judgment only.
[1] The Beggs had only named Terry Shue in their initial complaint. However, during the course of the proceedings, the Beggs filed an amended complaint joining Kay Shue as another defendant.
[2] Orr described a drainage swale to be a naturally occurring "low area in the surface where the concentration of water from a surrounding area would run down that low drainage area. It would be a low spot where all surface water would run off."