DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Barbara Shuman ("Shuman"), appeals from a judgment of the Lorain County Court of Common Pleas that granted permanent custody of her child, Frederick Songer, Jr. ("Frederick"), to Lorain County Children Services ("LCCS"). We affirm.
Shuman is the mother of four older children, Christopher, Amanda, Ashley, and Dylan Shuman. Those four children are the offspring of her husband, Nathaniel Shuman ("Nathaniel"). Through three separate orders, spanning a period of two years, both parents' rights to those four children were involuntarily terminated. The primary reasons for the termination of parental rights were physical abuse of the children by Nathaniel, leading to a criminal conviction, and Shuman's failure to address the abuse issue in order to protect her children from it. In essence, Shuman demonstrated an inability to put the needs of her children ahead of her own needs and those of her husband. Shuman's relationship with Nathaniel eventually ended after the couple had lost all four children.
Shuman began a relationship with another man, Frederick Songer ("Songer"), and on January 7, 2000, gave birth to her fifth child, Frederick Songer, Jr. ("Frederick"). LCCS took emergency custody of Frederick just days after his birth. LCCS had received information that this child's father, Songer, had been adjudicated as a sex offender while he was a juvenile. The victims of his crimes were male and female children. Based on its extensive prior involvement with Shuman, LCCS was concerned about her ability to protect Frederick from such a risk. Frederick was adjudicated dependent and placed in the temporary custody of LCCS on March 17, 2000.
Because Frederick had a family history of developmental delays and exhibited stiffness in his legs and right arm, he was referred to the Lorain County Board of Mental Retardation and Developmental Disabilities for early intervention. LCCS encouraged the natural parents to participate in his physical therapy sessions.[1] Weekly visitations, ranging from two to four hours in length, were scheduled to coincide with physical therapy so Shuman and Songer would have the opportunity to educate themselves about Frederick's needed therapy. Neither natural parent participated actively in physical therapy, however, nor did they interact much with Frederick during their visits. Of the fifty-five to fifty-seven visits that the parents attended, they ended more than half of them at least thirty minutes early, each time offering what LCCS considered to be an inadequate excuse. The parents ended several of the visits two to three hours early.
LCCS moved for permanent custody of Frederick on December 6, 2000. The trial court held hearings on the motion during April 2001. On May 1, 2001, the trial court granted the motion for permanent custody. Shuman appeals, assigning two errors.
 First Assignment of Error THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND IN VIOLATION OF O.R.C. 2151.414, THE FOURTEENTH
AND NINTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 1 OF THE OHIO CONSTITUTION, WHEN IT TERMINATED THE PARENTAL RIGHTS OF APPELLANT AND GRANTED PERMANENT CUSTODY OF THE MINOR [CHILD] TO LORAIN COUNTY CHILDREN SERVICES, WHERE THE EVIDENCE FAILED TO SATISFY THE REQUISITE STANDARD OF PROOF.
Shuman argues that the trial court's decision to terminate her parental rights was not supported by the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175. Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati (1988),38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id.
Termination of parental rights is an alternative of last resort, but is sanctioned when necessary for the welfare of a child. In re Wise (1994),96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, who is neither abandoned nor orphaned, it must find by clear and convincing evidence that (1) the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E), and that (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1); see, also, In re William S. (1996), 75 Ohio St.3d 95,99. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 Whether Child Can be Placed with Either Parent
When determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the juvenile court must find by clear and convincing evidence that at least one of the enumerated factors in R.C. 2151.414(E) exists as to each of the child's parents. In re William S., 75 Ohio St.3d at 101. Those factors include:
 (1) Following the placement of the child outside the child's home * * *, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. * * * [;]
* * *
 (11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child.
* * *
(16) Any other factor the court considers relevant.
R.C. 2151.414(E). The juvenile court should consider all relevant evidence when making such a determination. R.C. 2151.414(E). If the court finds that any of the conditions enumerated in R.C. 2151.414(E) exist, the statute mandates that the court enter a finding that the child cannot or should not be placed with either parent within a reasonable time. Inre Higby (1992), 81 Ohio App.3d 466, 469.
Shuman argues that the evidence demonstrated that she substantially complied with the requirements of her case plan. Therefore, she asserts, LCCS failed to establish that "the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1). Although we disagree with Shuman's assessment of the evidence, it was not necessary for LCCS to establish the existence of multiple factors.
To satisfy the requirements of R.C. 2151.414(E), LCCS was required to establish only one of the enumerated factors. Therefore, even if Shuman were to convince us that the trial court erred in its finding under R.C.2151.414(E)(1), she presents no argument to refute the trial court's finding of the factor enumerated in R.C. 2151.414(E)(11).
In March 1996, January 1998, and March 1998, the Lorain County Court of Common Pleas involuntarily terminated Shuman's parental rights to her four older children, Christopher, Amanda, Ashley, and Dylan. The two oldest children, the couple's only children at the time, were removed from the home because their father had physically abused them, culminating in a criminal conviction. Each of the younger children was removed after birth to prevent any potential for abuse. Despite the fact that Nathaniel Shuman was convicted of criminal charges stemming from his physical abuse of his two oldest children, Shuman continued to reside with him and attempt to bring more children into the home, yet she failed to acknowledge the abuse issue or take steps to protect her children from it. Over a period of four years, Shuman failed to remedy the conditions causing those children to be placed outside the home.
There was ample evidence before the trial court to demonstrate that Shuman had failed to break her pattern of living with an abuser and refusing to address the problem to protect her children. Although Shuman had ended her relationship with Nathaniel Shuman, her relationship with Songer exhibited a pattern that was all too familiar to LCCS. Shuman was again living with a known abuser of children. As she had in her prior relationship, Shuman refused to acknowledge the fact that her partner had committed prior acts of abuse and that those prior acts posed a threat to her family. She often denied that the incidents had even taken place, or, if she did accept that the incidents had occurred, she downplayed their significance by stressing that they were in the past. Admitting the problem was only the first step toward protecting her children from it. Shuman then needed to attend individual counseling, relationship counseling, and parenting classes to address the problem, and, if necessary to protect her child, end her relationship with Songer. After fifteen months, Shuman had failed to accomplish even the first step in the process.
Given that the trial court found that the factor set forth in R.C.2151.414(E)(11) had been established, the court was required to find that Frederick could not or should not be placed with Shuman within a reasonable time. Therefore, Shuman has failed to demonstrate any error by the trial court on this prong of the statutory test.
 Best Interest of the Child
When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
[C]onsider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed * * * through the child's guardian ad litem[;]
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.
R.C. 2151.414(D)(1)-(5).
Shuman's only interaction with Frederick was through scheduled weekly visitations because Frederick was removed from the home shortly after his birth. Because of Frederick's young age and the need to establish a bond, LCCS encouraged additional visits and repeatedly attempted to establish a second day of visitation each week, with hopes of eventually allowing overnight visitation. Shuman refused to commit to a second day of visitation, however. Overnight visits were never offered because the parents never advanced to that point.
Although Shuman did attend most of the scheduled weekly visits, she ended more than half of them at least thirty minutes early and ended several of the visits two to three hours early. She participated only minimally in the physical therapy sessions and often arrived late. According to the testimony of Shuman's casework supervisor, Shuman offered frequent "excuses" for ending visits early, most of which LCCS did not consider to be acceptable reasons. Shuman's excuses included doctor's appointments, which the agency felt could have been scheduled on another day or time; bad weather, when the couple lived only five minutes away from the agency; and Songer's need to go to work. Even if Songer did in fact need to work at that time, the agency saw no need for Shuman to also end those visits early.
LCCS workers testified that there was no apparent bond between Shuman and Frederick. He showed no reaction when he would see her each week. Shuman did not interact much with him and exhibited little affection toward him. LCCS workers did observe bonding between Frederick and the foster mother, however. He has been with his current foster mother since he was one week old. The foster mother had educated herself about Frederick's developmental needs, including physical therapy, speech therapy, and occupational therapy.
Frederick had lived with his foster mother for his entire short life but for a few days after his birth that he spent with his parents. By the time that the permanent custody hearing began, he had been in the temporary custody of LCCS for more than twelve months. The twelve-month period was particularly significant here because it represented almost the entire life of Frederick.
As Frederick was only fifteen months old at the time the hearing began, his wishes were expressed through the guardian ad litem. The guardian ad litem indicated that the parents had demonstrated an inability to provide for Frederick's basic needs, stressing his particular developmental and medical needs. The guardian ad litem
recommended that permanent custody be awarded to LCCS and that adoption by the current foster mother be pursued.
Because Frederick has ongoing medical and developmental needs, numerous witnesses testified that he has a particular need for a secure placement. Shuman failed to demonstrate an ability to provide such an environment. She did not participate actively in the physical therapy and demonstrated an inability to commit to two to four hour weekly visits. Her caseworker believed that she would not be able to commit to all of Frederick's needed physical therapy, speech therapy, and occupational therapy. The foster mother, on the other hand, has been meeting all of those needs and has expressed an interest in adopting Frederick.
One of the factors in R.C. 2151.414(E)(7) to (11) is relevant here. Specifically, R.C. 2151.414(E)(11) requires the trial court to consider the fact that "[t]he parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 [2151.35.3] or 2151.415 [2151.41.5] of the Revised Code with respect to a sibling of the child." As explained above, Shuman had her parental rights to four older children involuntarily terminated primarily due to physical abuse by her husband and her failure to protect the children from that abuse. Although Shuman ended her relationship with her husband, her current relationship with Songer is riddled with the same problems as her former relationship with her husband: the partner is a known abuser of children and Shuman refuses to admit that fact and take steps to protect her child from the potential risk of abuse.
The trial court had before it clear and convincing evidence that permanent custody to LCCS was in the best interest of this child. Shuman has failed to demonstrate that the trial court erred by finding that Frederick could not or should not be placed with her within a reasonable time and that an award of permanent custody to LCCS was in his best interest. The first assignment of error is overruled.
 Second Assignment of Error THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ALLOWING THE REPORT OF CLINICAL COUNSELOR PAT [CHMURA] AS TO PRIVILEGED COMMUNICATION MADE TO HER BY APPELLANT IN VIOLATION OF THE PSYCHOLOGIST PRIVILEGE AS SET FORTH IN OHIO REVISED CODE SECTION 4732.19.
Shuman argues that the trial court erred by admitting the report of Pat Chmura, who examined her pursuant to the court's order that Shuman undergo a psychological evaluation as part of her case plan, because Chmura's evaluation was based on a privileged communication between psychologist and patient. Shuman maintains that the trial court had no authority to allow Chmura's testimony because it was within the psychologist/patient privilege as set forth in R.C. 4732.19 and as construed by the Ohio Supreme Court in In re Wieland (2000),89 Ohio St.3d 535, which held that, even though a psychologist's treatment was performed as part of a court-ordered case plan, the psychologist's testimony remained privileged because there was no statutory exception to "allow for the in-court disclosure of confidential information on the basis that the treatment or service received by the patient or client was involuntary in nature, ordered as part of a journalized case plan provided in R.C. 2151.412[.]" Id. at 537-538, syllabus.
Although Shuman relies on incorrect statutory law, because Chmura is a licensed professional clinical counselor, not a licensed psychologist, the reasoning in In re Wieland applies with equal force to clinical counselors. See id. at syllabus.
After the Supreme Court decided In re Wieland, however, R.C.2317.02(G)(1) was amended to add a specific exception, in which the testimonial privilege pertaining to communications to professional clinical counselors will not apply:
 The testimony is sought in a civil action and concerns court-ordered treatment or services received by a patient as part of a case plan journalized under section 2151.412 [2151.41.2] of the Revised Code or the court-ordered treatment or services are necessary or relevant to dependency, neglect, or abuse or temporary or permanent custody proceedings under Chapter 2151. of the Revised Code.
R.C. 2317.02(G)(1)(g).
The record indicates that Shuman underwent an assessment by Chmura as part of her case plan that had been journalized by the court and incorporated by reference in its March 17, 2000 order that adjudicated Frederick dependent and granted temporary custody to LCCS. Therefore, Shuman had no right to assert a statutory privilege because Chmura's report fell within the exception set forth in R.C. 2317.02(G)(1)(g).
In her reply brief, Shuman attempts to add a constitutional argument to her original statutory argument. The reply brief, however, is "merely an opportunity to reply to the brief of the appellee." Sheppard v. Mack
(1980), 68 Ohio App.2d 95, 97, fn. 1; Loc.R 7(c) of the Ninth District Court of Appeals. Shuman cannot present new arguments that were not raised in her original brief. See Sheppard, 68 Ohio App.2d at 97, fn. 1; Loc.R. 7(c). Consequently, her constitutional arguments will not be addressed.
Because Shuman has failed to demonstrate any error by the trial court in admitting the report of Pat Chmura, her second assignment of error is overruled.
 III.
Shuman's assignments of error are overruled. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
SLABY, J., CARR, J. CONCUR.
[1] Although Frederick also received regular speech therapy and occupational therapy, it is unclear from the record whether his parents were invited to attend those sessions.