This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
Appellant, Charlotte Bennett, appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of four of her minor children to the Summit County Children's Services Board ("CSB"). We affirm.
Ms. Bennett is the mother of six children, two of whom were voluntarily relinquished to the custody of relatives and are not at issue in this case. The parental rights to the four remaining minor children constitute the subject of this appeal. These children are: Maurice, born December 6, 1993; Rickiya, born May 3, 1995; Rickquan, born June 6, 1996; and Rickayla, born August 2, 1997. The fathers of these children did not participate in the proceedings before the trial court and are not parties to this appeal.
On October 2, 2000, CSB filed sworn complaints, alleging that each of the minor children were neglected and dependent. The complaint was filed after the children were taken into custody by the Akron Police Department when the six children were found home alone while their mother was at work. At that time, the children ranged in age from one month to eight years old. The juvenile court granted CSB emergency temporary custody.
On December 15, 2000, the children were adjudicated to be dependent and neglected children. The dispositional hearing followed, and, on January 12, 2001, the court ordered the children committed to the temporary custody of CSB. On August 3, 2001, CSB filed a motion for permanent custody of the children. Following a hearing on the motion, the juvenile court terminated the parental rights of Ms. Bennett and granted permanent custody of the children to CSB. This appeal followed.
Ms. Bennett asserts two assignments of error. We will discuss them together to facilitate review.
 First Assignment of Error "THE JUVENILE COURT ERRED IN GRANTING THE SUMMIT COUNTY CHILDREN SERVICES BOARD'S MOTION FOR PERMANENT CUSTODY OF MAURICE BENNETT, RICKIYA BENNETT, RICKQUAN BENNETT AND RICKAYLA BENNETT WHERE SUCH ACTION WAS NOT IN THE BEST INTEREST OF THE CHILDREN AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 Second Assignment of Error "THE TRIAL COURT ERRED IN GRANTING SUMMIT COUNTY CHILDREN SERVICES BOARD'S MOTION FOR PERMANENT CUSTODY OF MAURICE BENNETT, RICKIYA BENNETT, RICKQUAN BENNETT AND RICKKAYLA BENNETT WHERE SUCH ACTION WAS BASED UPON A FINDING THAT THE CHILDREN CANNOT BE PLACED WITH MOTHER WITHIN A REASONABLE PERIOD OF TIME AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
In her first assignment of error, Ms. Bennett asserts that there was not clear and convincing evidence that granting permanent custody of the children to CSB was in her children's best interest. In her second assignment of error, Ms. Bennett asserts that there was not clear and convincing evidence that the children could not or should not be placed with their mother within a reasonable period of time. We disagree with both assertions.
When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction."
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175; see, also, State v. Otten
(1986), 33 Ohio App.3d 339, 340.
Moreover, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the juvenile court]." Karches v.Cincinnati (1988), 38 Ohio St.3d 12, 19. Furthermore, "if the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment." Id. Accordingly, before an appellate court will reverse a judgment as being against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
The termination of parental rights is governed by R.C. 2151.414. As relevant to this case, before a juvenile court may terminate parental rights with regard to a child who is neither abandoned nor orphaned, it must apply a two-prong test and find by clear and convincing evidence that: (1) it is in the best interest of the child to be placed in the permanent custody of the petitioning agency, based on an analysis under R.C. 2151.414(D), and (2) that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E). See R.C. 2151.414(B); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will produce in the trier of fact `"a firm belief or conviction as to the facts sought to be established.'" Inre Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v.Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
In determining what is in the best interests of the child under R.C.2151.414(D), the court should consider all relevant factors, including, but not limited to, the following statutory factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster care-givers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]"
In considering whether the children can or should be placed with a parent within a reasonable time, the court is to consider all relevant evidence. R.C. 2151.414(E). R.C. 2151.414(E) also contains separate factors, the presence of any one of which requires the court, upon a finding by clear and convincing evidence that the factor is present or occurred in the case, to enter a finding that the child cannot or should not be placed with a parent within a reasonable time.
Evidence was presented at the hearing on the motion for permanent custody through several witnesses. Judy McKinney, a probation officer for the Akron Municipal Court, stated that she supervises offenders who are on probation and that her supervision of Ms. Bennett began in 1999 in relation to Ms. Bennett's child endangering conviction. Ms. McKinney stated that Ms. Bennett's treatment plan with the probation department included involvement with CSB, Family Solutions, and the Oriana House. She also stated that supervision of Ms. Bennett involved monitoring her drug usage.
Ms. McKinney testified that, as a result of a probation violation, Ms. Bennett was incarcerated in the Summit County Jail in April 2001. Ms. McKinney explained that Ms. Bennett failed to comply with the program goals of her placement at Oriana House, explaining that Ms. Bennett physically threatened a caseworker and a staff member, was missing at times, came to the Oriana House intoxicated, and tested positive for marijuana. Ms. McKinney related that Ms. Bennett has a long history of noncompliance with CSB, as well as other agencies that Ms. Bennett has been involved with since she was a child.
Janet Humes, a case manager at Family Solutions, testified that Family Solutions began to provide services to Ms. Bennett in March 2000 through a CSB referral. Ms. Humes stated that Ms. Bennett was diagnosed with a phase of life and neglect of child problem. She explained that Ms. Bennett had an individual treatment plan, the goal of which was to increase her self-sufficiency. Ms. Humes described Ms. Bennett's strengths as being cooperative and wanting to improve herself.
Ms. Humes testified that, from June 2000 through October 2000, Family Solutions had no contact with Ms. Bennett. She stated that, in October 2000, after CSB had removed her children from the home, Ms. Bennett contacted Family Solutions again; however, in May 2001, Ms. Bennett's case was closed with the agency due to her incarceration. She then stated that Ms. Bennett contacted the agency again once she got out of jail but that her case could not be reinstated until she paid her outstanding bills. Ms. Humes testified that she was concerned with Ms. Bennett's level of progress because sometimes Ms. Bennett would work on her treatment plan, and, at other times, she would not.
Theresa Koff, an intensive outpatient counselor at the Community Health Center, testified that Ms. Bennett was referred to the drug and alcohol treatment center by Oriana House and CSB. Ms. Koff stated that Ms. Bennett's date of intake was January 9, 2001 and that she provided information in her original assessment that she was using marijuana on a daily basis. Ms. Koff explained that, at first, Ms. Bennett received counseling one time per week on an outpatient basis. Later, in April of 2001, just prior to Ms. Bennett's incarceration, Ms. Bennett began more extensive treatment in the intensive outpatient program. Ms. Koff testified that Ms. Bennett attended counseling on a regular basis but that she did not complete the recommended program due to her incarceration.
When asked about Ms. Bennett's drug screens, Ms. Koff related that Ms. Bennett tested positive for cannibis on January 9, February 2, March 19, and April 9 of 2001. Ms. Koff then testified that, once Ms. Bennett began the intensive outpatient program, she tested negative on April 13, April 16, April 18, and April 25. Ms. Koff stated that, in her opinion, Ms. Bennett was making progress in the treatment program prior to her incarceration.
Joanna Brown, an outpatient therapist at the Child Guidance Center, stated that she has provided counseling to both Maurice and Rickquan. She testified that Ms. Bennett brought Maurice to the center on her own accord before the children were taken into custody by CSB and that Rickquan was later referred by CSB. Ms. Brown stated that both Maurice and Rickquan were currently taking medication to address their ADHD symptoms.
Ms. Brown explained that her primary goal with Maurice is to increase his attention skills and that, since he began taking medication, his disruptive behavior in the classroom has diminished. Ms. Brown explained that her primary goals for Rickquan are behavior management, increasing his listening skills, and increasing his positive responses to adult requests. She explained that Rickquan has continued to act in a disruptive manner in the classroom and that his progress with his behavior goals has been more sporadic than his brother. Ms. Brown testified that Rickquan has been having difficulty adjusting to all the new changes in his life.
When Ms. Brown was asked whether she had met with Ms. Bennett, she stated that she had scheduled an appointment with Ms. Bennett but that Ms. Bennett had failed to appear at the appointment. Ms. Brown testified that both boys need ongoing treatment and an environment that is highly structured with a regular schedule and consistent rules.
Sue Wheeler, a psychiatric social work supervisor at the Child Guidance Center, testified that she has provided counseling to both Rickiya and Rickayla. She stated that her initial diagnosis for the children was that each had a disruptive behavior disorder and were victims of neglect. Ms. Wheeler testified that the children had been removed from the home because they had been left alone and because the family had a history of between twelve to fifteen referrals to CSB relating to neglect. Ms. Wheeler also testified that it was very difficult for the girls to adjust to their foster homes because they were not used to having any structure or rules, explaining that she believed that the girls' older sister, who had been eight when the children were removed from the home, was the person who had been taking care of her younger siblings much of the time.
Ms. Wheeler testified that there has been some progress in the girls' treatment but noted that, for the past few weeks, Rickiya's behavior had become increasingly worse. Ms. Wheeler stated that, during counseling, Rickiya repeatedly mentioned that her mother had not been at home when the police had come to take her and her siblings out of the house. She further stated that Rickiya had been acting in a destructive manner in her foster home by dumping out cleanser and other items in the house, marking on the walls and floor, and taking things from others who live in the home. Ms. Wheeler stated that Rickayla was similarly having problems in her preschool setting. Ms. Wheeler testified that she was concerned for the girls because they needed to be taught basic things, such as how to listen to an adult, how to follow rules, and that it was inappropriate to punch, kick, and bite other people.
Joanna Hannah, an Early Start coordinator at the Akron Children's Hospital, stated that Ms. Bennett was first referred to the Early Start parenting program when her son was going to have medical work done at the hospital. Ms. Hannah stated that Ms. Bennett was eager to learn and that, despite the fact that the parenting program only required eight sessions, Ms. Bennett attended fourteen sessions. Ms. Hannah testified that, from June to September of 2000, Ms. Bennett voluntarily attended the parenting classes. Then, after CSB removed the children from their home, Ms. Bennett voluntarily attended a second session of parenting classes from January to March of 2001. Ms. Hannah stated that Ms. Bennett did the best she could with the parenting skills that she had, noting that Ms. Bennett distrusted people due to her involvement with the juvenile system at a young age.
Mandy Slagle stated that she used to be employed as a caseworker at CSB and that, during the fall of 2000, she became involved in Ms. Bennett's case. Ms. Slagle explained that the family had an extensive history with CSB, including at least one other occasion where the children had been taken into custody by CSB. She stated that, in October of 2000, the Bennett children were taken into custody when they were found home alone. Ms. Slagle testified that, according to Ms. Bennett's then eight-year-old daughter, there had been several occasions where the children had been left home alone.
Ms. Slagle testified that a case plan was prepared to address CSB's concerns for Ms. Bennett; these concerns involved supervision of the children, steady employment, housing, the children's behavior, and the mother's past drug history. When discussing Ms. Bennett's case plan objectives, Ms. Slagle stated that she felt that Ms. Bennett had made very little progress with regard to supervision issues. Similarly, Ms. Slagle stated that, while Ms. Bennett at first seemed to be making progress with regard to her parenting skills, by February 2001, she had stopped making any further progress. Ms. Slagle testified that Ms. Bennett had a sporadic employment history, had difficulty in maintaining housing appropriate for the children, and that medical care became an issue when the children did not receive their immunizations. Ms. Slagle further testified that Ms. Bennett had a history of using marijuana and that one of her children had even reported her usage to a school worker.
Ms. Slagle related that it was very difficult to arrange visitations with all of the children and that the situation was complicated by the fact that Ms. Bennett would either cancel the visitations with very little notice or simply not show up at all. Ms. Slagle further testified as to the children's behavior problems, noting that the children had difficulty with settling down and behaved in an aggressive manner at times. Ms. Slagle also stated that there had been reports by foster parents of sexually inappropriate activities by the children, which involved the humping of a pillow or stuffed animal, using words such as gay and "doing the nasty" while playing with dolls, and attempting to kiss another child in the foster home.
Alexis Knott, a social worker with CSB, testified that the Bennett case was transferred to her caseload in the spring of 2000 when Ms. Slagle resigned from CSB. Ms. Knott stated that, throughout most of the time that she has had the case, Ms. Bennett was not able to be in compliance with her case plan due to the incarceration. Ms. Knott also stated that she has not had contact with any of the children's fathers, noting that the fathers do not have a relationship with the children and that Ms. Knott was unaware of their current locations.
Ms. Knott testified that, since her release from incarceration in September of 2001, Ms. Bennett has found employment and has been able to visit with her children three times. Ms. Knott stated that, although the children have been separated from their mother since September of 2000, the children interact well with Ms. Bennett and appear to have bonded with her. Ms. Knott testified that the family has a history with CSB and noted that this is not the first time the children have been removed from the house due to being left home alone. Ms. Knott further testified that Ms. Bennett has made minimal efforts to achieve the goals of her case plan, stating that Ms. Bennett's behavior choices led to her incarceration. When asked what she would recommend in terms of the children, Ms. Knott testified that she would recommend granting permanent custody to CSB.
Gladys Washington, the grandmother of one of Ms. Bennett's children who is not an issue in this case, testified that she has known Ms. Bennett for several years. She explained that, throughout their friendship, Ms. Bennett has attended church and family functions with Ms. Washington. She also stated that, in her opinion, Ms. Bennett is a good mother who tries her best to provide for her children, both in terms of essentials and nonessentials so that each child feels that he or she is cared for and treated equally. Ms. Washington testified that Ms. Bennett works many hours, attends classes at the University of Akron, and still has time to interact with and discipline her children. Were Ms. Bennett able to have custody of her children, Ms. Washington stated that she could assist in such things as babysitting or transportation.
Ms. Bennett testified that she is currently employed and plans to begin nursing classes in one month. She stated that she attended the University of Akron for three semesters where she studied nursing and that she now intends to complete the program. Ms. Bennett testified that she receives no support from the fathers of her children and that, in the past, she has worked two jobs to provide for the children. Ms. Bennett denied that she intended to leave the children home alone in September of 2000, stating that she had a babysitter who did not take care of the children as promised. Ms. Bennett revealed the name of the babysitter but explained that the woman was not present at the hearing because she could not be located.
Ms. Bennett testified that she always attended to her children's medical needs, describing in detail a serious medical procedure that Rickquan had needed due to the soft spot on his head closing too soon as a baby. Similarly, she testified that she has always made sure that her children had housing, even if it meant that they had to live with someone else at the times when she could not afford to pay rent. When asked about the various programs that she had been involved with in the past, Ms. Bennett testified that she recognized that she has shortcomings but that she wants to improve her parenting skills. Ms. Bennett explained that she has had problems in counseling due to her lack of trust in the people who were trying to help her.
Ms. Bennett stated that, in relation to an Akron Municipal Court case, her case plan objective involved drug treatment for her marijuana usage. She explained that she was also tested for drug usage in relation to the present juvenile court case. Ms. Bennett testified that she was involved in the intensive outpatient program offered through the Community Health Center for three weeks prior to her incarceration and that, during her involvement in that program, her drug test results were negative.
Ms. Bennett testified that she recognized that her children had behavior problems prior to their removal from the home. She stated that, through the Child Guidance Center, she was able to enroll Maurice in counseling and fill out an application for Rickiya and Rickquan to also receive counseling before CSB's involvement. Ms. Bennett stated that, prior to her incarceration, she had not been able to attend visitations with her children on a regular basis due to transportation and work problems.
Ms. Bennett testified regarding her period of incarceration. She stated that she was involved with a behavioral health program, a woman's issues group, A.A. meetings, and a bible class. She also stated that she took a position that entailed providing any necessary assistance to the deputies such as cleaning or laundry. Ms. Bennett testified that she inquired about her children through calls placed to Ms. Knott and their guardian ad litem, Ms. Allison.
Ms. Allison testified that, as the children's guardian ad litem, she has observed the children for the past year. With regard to Maurice, she testified that, due to his medication for ADHD, he has improved in school. She stated that he misses his brother Rickquan since he has been removed from his previous foster home. Ms. Allison testified that Rickquan has serious behavior problems and has even displayed such problems during therapy sessions to the point that he must be separated from his brother during the sessions She noted that Rickquan also missed Maurice since the change in foster homes.
Ms. Allison testified that Rickiya is very smart but tends to fidget in class and attempts to intimidate or cause a confrontation with other children. Ms. Allison testified that Rickayla also exhibits severe behavioral problems, referring to an extensive tantrum that Rickayla had recently thrown. Ms. Allison acknowledged that all of the children love Ms. Bennett but stated that she felt Ms. Bennett would need extensive help if she were going to be able to properly care for these children. Ms. Allison referred to the fact that, in the past, the oldest daughter who is now in the permanent custody of relatives was the person who provided her mother with the support that she needed.
Upon review, this court finds that the juvenile court did not err in concluding that it was in the best interest of the children to be placed in the permanent custody of CSB. We find substantial evidence in support of that judgment, and, furthermore, the record indicates that the relevant factors in 2151.414(D) weighed in favor of termination. Additionally, based upon the relevant evidence before the juvenile court, this court finds that the junvenile court did not err in concluding that the children cannot or should not be placed with Ms. Bennett within a reasonable time. The judgment of the juvenile court is supported by the weight of the evidence. Accordingly, Ms. Bennett's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
BAIRD, P.J., CARR, J. CONCURS.