DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, Floyd J.S., Jr. ("Father"), appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, which entered a dependency adjudication with respect to his natural minor children, A.S. F.S., and placed them in the temporary custody of the Summit County Children Services Board ("CSB"). We affirm.
 I. {¶ 2} Mother and Father were married and living together with A.S., dob July 18, 1998, and F.S. dob April 27, 2004, at the time that this case commenced. The mother of the children, Channon S. ("Mother"), is not a party to this appeal. On April 29, 2004, CSB filed complaints alleging that A.S. was neglected and dependent, and F.S. was abused, neglected, and dependent, pursuant to R.C. Chapter 2151. CSB asserted that on April 28, 2004, it received a referral regarding the welfare of A.S. and F.S. CSB had an open case involving A.S. since January 2004, based on another referral. A.S. had previously been in the custody of CSB in 2000 and 2001, but that case file is not part of the record before us in the instant appeal.
 {¶ 3} The court granted an emergency order of custody to the CSB, and a guardian ad litem was appointed for both children. An adjudicatory hearing was held before a magistrate, who subsequently issued a decision adjudicating F.S. a dependent child per R.C. 2151.04(C) and A.S. a dependent child per R.C.2151.04(D). Charges of neglect and abuse were dismissed with respect to both children. The trial court adopted the magistrate's decision and independently entered dependency adjudications as to both children.
 {¶ 4} Mother and Father filed separate objections to the magistrate's decision. In the interim, the magistrate issued a decision recommending the grant of temporary custody of A.S. and F.S. to CSB; the court also adopted this decision and independently ordered the placement of both children in CSB's temporary custody.
 {¶ 5} Thereafter, the court issued an order that overruled Mother and Father's objections and reiterated the finding of dependency as to both children. This appeal followed.
 {¶ 6} Father timely appealed, asserting two assignments of error for review.
 II. A. First Assignment of Error
"The trial court's finding of dependency was not supported by substantial credible evidence and was against the manifest weight of the evidence."
 {¶ 7} In his first assignment of error, Father asserts that the finding of dependency was not supported by sufficient evidence and was against the manifest weight of the evidence. We disagree.
 {¶ 8} In determining whether a judgment of a juvenile court is against the manifest weight of the evidence, this Court applies the same standard of review as that in the criminal context. In re R.S., R.S., A.P., and A.G., 9th Dist. No. 21177, 2003-Ohio-1594, at ¶ 10. Therefore, in determining whether a juvenile adjudication is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]" Id., quoting State v. Thompkins (1997),78 Ohio St.3d 380, 387.
The discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the [adjudication]." Thompkins, 78 Ohio St.3d at 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 9} A dependency adjudication must be supported by clear and convincing evidence. Juv.R. 29(E)(4); R.C. 2151.35. Clear and convincing evidence is such evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the conclusion to be drawn. In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368.
 {¶ 10} In addition, "[a]n appellate court must afford great deference to the weight given by the trial court to the evidence and the credibility of witnesses." In re Shuman (May 19, 1999), 9th Dist. No. 98CA007082, at *6, citing Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77, 79-80. "Every reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." Karches v. Cincinnati
(1988), 38 Ohio St.3d 12, 19. "[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the * * * judgment, most favorable to sustaining the trial court's * * * judgment." Id.
 {¶ 11} In the instant case, the trial court concluded that F.S. was a dependent child under R.C. 2151.04(C) and A.S. was a dependent child under R.C. 2151.04(D). Under 2151.04(C) and (D), a "dependent child" means the following:
"(C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship;
"(D) To whom both of the following apply:
"(1) The child is residing in a household in which a parent, guardian, custodian, or other member of the household committed an act that was the basis for an adjudication that a sibling of the child or any other child who resides in the household is an abused, neglected, or dependent child.
"(2) Because of the circumstances surrounding the abuse, neglect, or dependency of the sibling or other child and the other conditions in the household of the child, the child is in danger of being abused or neglected by that parent, guardian, custodian, or member of the household."
 {¶ 12} The trial court entered a finding of dependency on the basis that there were "serious concerns regarding whether [A.S. and F.S.] [we]re receiving adequate care." Specifically, the court found:
"[A.S.] is small for her age and her pediatrician recommended that she take Pediasure. Mother testified that she was unable to administer Pediasure to [A.S.] because the child refused to drink it, and instead, relied on a diet of fatty foods in an attempt to have her daughter gain weight. Furthermore, the Court is concerned with [A.S.'s] two chronic infestations of head lice within a six-month period. Such occurrences raise questions of whether the children are being properly cared for."
 {¶ 13} Additionally, the court noted, that, while the mother's and F.S.'s toxicity screens taken at F.S.'s birth returned negative results, the mother had three positive drug screens during her pregnancy with F.S; and further, that the mother was aware that she should not be taking the prescribed medications that turned up in these drug screens because of the possibility they could have a negative effect on the unborn child.
 {¶ 14} The intake worker from the CSB that investigated the case, Anne Henrick, testified that the CSB received several referrals which indicated that "a lot of fighting [was] going on in the home, the parents were using drugs and alcohol, concerns that a person OD'd there due to methamphetamine, that father was using methamphetamine, * * * and concerns that [A.S.] had been hit by her father." Henrick received another referral on April 28, 2004, the day after F.S.'s birth date. The referral alleged that Mother had tested positive for drugs at the time of F.S.'s birth, that she had tested positive for benzodiazepines[1]
on three other occasions in the prenatal clinic, and that F.S. was born one month premature with a low birth weight.
 {¶ 15} Henrick went to the family's home in January 2004 to respond to a referral indicating that the couple was fighting. The parents admitted that they had been fighting the evening before because a friend had brought two prostitutes to the home, and Mother had to drive them home. Henrick stated that she did not otherwise find evidence of substance, child abuse, or violence by either parent, and that both parents denied substance abuse. However, when asked to submit to drug testing, both parents refused. Mother insisted that she was only taking prenatal vitamins at the time. Henrick testified that Father has repeatedly refused to submit to drug testing. Henrick had also received reports of a methamphetamine lab in the home; when asked to see the basement, she was denied access. Mother and Father confirmed that Mother's brother had died of an overdose in their home, but the death certificate they produced at the adjudicatory hearing revealed that the brother had died from an overdose of Fentanyl, a chronic pain medication.
 {¶ 16} CSB expressed concern that Mother denied that she was taking anything other than prenatal vitamins. Both Mother and F.S.'s drug screens at birth were negative for any substances. However, three drug screens taken during her pregnancy reflected benziodiazepines in Mother's system. At the adjudicatory hearing, Mother admitted that the prenatal positive screen results reflected her prescription for Xanax for treatment of her anxiety and depression. The second referral indicated that Mother was "very agitated" at the hospital and that she left the hospital 12 hours after giving birth to F.S., leaving him at the hospital. The hospital social worker also stated that seeing A.S.'s small size raised concern that F.S., as a "preemie," had a "risk of failure to thrive."
 {¶ 17} Mother testified that she had been treated for anxiety and depression, and that her physician prescribed her Xanax and Paxil in 2001. Mother testified that when she discovered that she was pregnant with F.S., she was still being prescribed these medications. However, she could not produce a current prescription for the Xanax. Mother testified that she sought prenatal care at the Akron City Hospital's free clinic, where she was informed by the doctors that it was not advisable to take the Xanax while she was pregnant because it was not healthy for the fetus. Mother acknowledged that she received this medical advice; she had also acknowledged to CSB that she knew the medication was addictive. However, she testified that she attempted to wean herself off the medication independently. However, Mother also admitted to taking Vicodin one time during the pregnancy, and that because she had a history of anxiety and depression and tended to get "hyper" during the pregnancy, she would continue to take low doses of Xanax during the pregnancy to "bring herself down."
 {¶ 18} The CSB also expressed concern over the parent's ability to provide adequate care for A.S. Henrick observed some behaviors in A.S. which she considered violent and hyperactive tendencies; in particular, during the interview; A.S. would punch and hit things. A.S. has developmental delays, and has been diagnosed with ADD. Henrick also discussed A.S.'s low weight problem. Henrick testified that it came to her attention that A.S. "had not been to the developmental clinic, that she needed to be seen there, concerns about her weight gain and the parents' lack of follow-through with other clinics."
 {¶ 19} Henrick herself contacted the physician's office, who informed her that the office "had ruled out all possible concerns that they could do within their office. However, on [February 9, 2004] a referral was made for an endocrinologist, that referral to rule out a growth hormone deficiency. That referral was never followed up on * * * as requested." Mother denied ever having received such a referral from the physician.
 {¶ 20} Henrick also spoke to her communication with A.S.'s preschool, which expressed "primarily concerns [with] chronic head lice, missing I think approximately 25 percent attendance, according to them, and concerns that they had relayed to me is that the education wasn't continued ongoing at home with reinforcing what she had learned in school." Henrick explained that A.S.'s absence interfered with her speech therapy classes.
 {¶ 21} In addition, Henrick testified as to her general concerns about the family situation, which involved a "significant history with Children Services, chronic patterns of substance abuse, domestic violence, * * * disorderly conducts, things of that nature." This Court has recently recognized the significance of such a record:
"[W]ith the addition of R.C. 2151.04(D), the legislature considered a parent's prior history with a child welfare agency significant in regard to a determination that a subsequent child might be dependent. Further, while R.C. 2151.04(D)(2) requires that the trial court base its finding of dependency, in part, on `other conditions in the household of the child,' the legislature did not limit which conditions may be considered." In re W.C.,Jr., 9th Dist. No. 22356, 2005-Ohio-2968, at ¶ 18.
 {¶ 22} Based upon our thorough review of the record, we cannot say that the trial court's dependency adjudication was not supported by clear and convincing evidence. See In re Adoptionof Holcomb, 18 Ohio St.3d at 368. Although there appears to be some conflicting testimony regarding whether the parents were complying with the physician's recommendations regarding A.S.'s health, we will not overturn the judgment simply because the trier of fact chose to believe the CSB's testimony over that of the parents. "[W]hen conflicting evidence is presented at trial, a [judgment] is not against the manifest weight of the evidence simply because the jury believed the prosecution testimony."State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at *5.
 {¶ 23} Therefore, we cannot say that the court "clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]" In re R.S., R.S., A.P.,and A.G. at ¶ 10; Thompkins, 78 Ohio St.3d at 387. We find that the dependency adjudication is not against the manifest weight of the evidence.
 {¶ 24} Father's first assignment of error is overruled.
 B. Second Assignment of Error
"The trial court violated appellants['] due process right to a fair hearing in violation of the united states constitution and adversely affected his rights under the ohio constitution."
 {¶ 25} In his second assignment of error, Father asserts that the trial court denied him his federal and state due process rights to a fair hearing.
 {¶ 26} Initially, Father complains that the court's findings regarding A.S.'s head lice, the parents' failure to provide A.S. with Pediasure, and the effect of Mother's medications on F.S.'s condition, were based on hearsay testimony. However, Father did not object to the testimony when it was presented during the hearing, and as such, has waived his right to raise this issue on appeal. See In re Christian (Dec. 1, 1999), 9th Dist. Nos. 19222 19223, at *13.
 {¶ 27} Next, Father complains that there was no clear and convincing evidence in the record to support the adjudication. Because this Court has already determined in our disposition of the first assignment of error that the court's adjudication was supported by clear and convincing evidence, we need not address this argument here.
 {¶ 28} Finally, Father argues that the State cannot regulate a mother's election to take medications during her pregnancy, and alleges prosecutorial misconduct. We do not express any opinion as to these arguments, because Father also failed to raise them to the trial court. As such, Father has waived the opportunity to raise these arguments on appeal. See Thrower v. Akron Dept. ofPublic Housing Appeals Bd. (Apr. 10, 2002), 9th Dist. No. 20735, at *7.
 {¶ 29} Father's second assignment of error is overruled.
 III. {¶ 30} Father's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Carr, P.J. Moore, J. Concur.
[1] Benzodiazepines belong to a group of medicines called central nervous system depressants and is used to treat conditions such as anxiety, panic disorder, and insomnia.