[Cite as *In re B.G.*, 2020-Ohio-1414.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

In re B.G.

Court of Appeals No. S-19-047

Trial Court No. 21730236

**DECISION AND JUDGMENT**

Decided: April 10, 2020

* * * * *

Laurel A. Kendall, for appellant.

Dean E. Ross, for appellee.

* * * * *

**SINGER, J.**

{¶ 1} This is an appeal from the September 26, 2019 judgment of the Sandusky County Court of Common Pleas, Juvenile Division, terminating the parental rights of appellant, C.C., the mother of B.G. ("the child"), and granting permanent custody of the

child to appellee, Sandusky County Department of Job & Family Services ("appellee" or "agency"). For the reasons that follow, we affirm the judgment.

{¶ 2} Appellant sets forth three assignments of error:

1. The trial court erred in finding the minor child herein had been in the temporary custody of Sandusky County Job and Family Services 12 of 22 months, pursuant to O.R.C. 2151.414(B)(1)(b), when the evidence on the record concerning the dispositional timeline was not clear and convincing.

2. The evidence supporting the trial court's finding the minor child herein had been abandoned pursuant to R.C. 2151.414(B)(1)(a) was not clear and convincing, and/or the court's decision was against the manifest weight of the evidence.

3. The evidence supporting the trial court finding the minor child herein could not be returned to mother pursuant to O.R.C. 2151.414(B)(1)(c) was not clear and convincing, and/or the court's decision was against the manifest weight of the evidence.[1]

---

[1] We note that appellant's citations are incorrect. Nonetheless, we will address the merits of appellant's arguments, and apply the correct code sections.

2.

**Background**

{¶ 3} Appellant was 15 years old when the child was born to her in July 2016. G.G. is the child's biological father. Father is not a party to this appeal.

{¶ 4} In January 2017, appellant and her younger sibling were removed from their parents' custody and were placed, along with the child, in the care of appellant's grandmother. Thereafter, appellant and the child were placed with S.K.

{¶ 5} On October 4, 2017, appellee opened a case after being contacted by S.K., who reported the child resided with her but appellant was in the juvenile justice center. S.K. informed appellee she did not want appellant to return to the home when released from detention because S.K. could not provide the level of supervision that appellant needed. Appellant had continued, negative behavioral issues which included leaving home without permission, smoking marijuana, and not following the rules of the home.

{¶ 6} On October 31, 2017, appellee took emergency temporary custody of appellant and the child. Appellant was placed in a group home for girls and the child was placed in a foster home.

{¶ 7} On November 1, 2017, a complaint in dependency and neglect was filed regarding the child. That same day, a shelter care hearing was held and appellee was awarded interim temporary custody of appellant and the child.

{¶ 8} On November 22, 2017, appellee filed a case plan with respect to appellant and the child. It was noted in the plan that the risks and safety threats which required the child to be removed included the child's grandmother could not care for him due to her

3.

drug use and mental health, so the child's great-grandmother had cared for him while appellant was staying with her 18-year-old boyfriend, and there was domestic violence in the great-grandmother's home. The plan set forth that appellant would: complete a drug and alcohol assessment; provide random drug tests when requested; take a mental health assessment; take medications as prescribed; participate in the Independent Living Program; follow the rules of her probation; have visits with the child; and follow all recommendations of the service providers.

{¶ 9} On December 6, 2017, an adjudicatory hearing was held; appellant consented to a finding that the child was dependent. In addition, appellant was found to be a neglected and dependent child. A magistrate's decision was filed on December 8, 2017.

{¶ 10} A dispositional hearing was held on January 5, 2018, where, according to the magistrate's decision filed on January 10, 2018, appellant "consented to the children being placed in the Temporary Custody of [appellee] and agreed to the services detailed in the Case Plan." Thereafter, numerous dispositional review hearings were held.

{¶ 11} In late December 2018, appellant was emancipated and voluntarily left appellee's custody. The child remained in the foster home.

{¶ 12} On March 5, 2019, a dispositional review hearing was held and the court extended appellee's temporary custody of the child until November 1, 2019. A magistrate's decision was filed on March 11, 2019.

4.

{¶ 13} On June 5, 2019, appellee filed a motion requesting modification of temporary custody to permanent custody, as well as a motion for a permanency hearing.

{¶ 14} On September 11, 2019, the guardian ad litem ("GAL") filed her final report and recommendation.

{¶ 15} The permanent custody hearing was held on September 24, 2019, and the court issued its findings of fact, conclusions of law, and judgment entry on September 26, 2019, granting permanent custody of the child to appellee. Appellant appealed.

## The Permanent Custody Hearing

{¶ 16} Appellant and father did not attend the hearing. Appellee called four witnesses: the child's foster mother, two caseworkers and the GAL. The testimony which is relevant to appellant's appeal is summarized below.

## Foster Mother

{¶ 17} Angela George testified she was the child's foster mother starting October 31, 2017, when he was one year old. At that time, the child could not communicate, he was addicted to any kind of technology screen and he did not play with toys. The child would scream, have tantrums and throw things. If the child did not have a phone in his hand, if the television was not on or if someone else had a phone, the child would scream and throw a fit. It took about three months to teach the child to use sign language to communicate or to point to what he wanted, and not scream. In addition, the child would eat everything put in front of him, and he had to be reminded to chew and

5.

slow down.  Foods with sugar caused the child to have diarrhea, which in turn caused diaper rash.

{¶ 18} George testified she had very good communication with appellant at first and would tell appellant about what the child was eating, that he had diarrhea and "let's not do this," and to limit his television time.  However, by December 2018, "communication really was not going well" so George started writing in a notebook, which she exchanged with appellant.  In the notebook, George wrote the child's mood before the visit, if he had eaten or needed to eat, if he needed diaper cream and reminders like no sugary foods.

{¶ 19} George had asked appellant, from the time appellant lived in the group home, to put diaper cream on the child during visits as the child had very sensitive skin and had diarrhea, so he needed diaper cream because the drive from the group home to the foster home was 20 minutes long.  Appellant did not buy diaper cream, so a staff member at the group home purchased it.  George tried many different types of diaper cream and found Desitin worked the best for the child.  George noted appellant "ended up purchasing some diaper cream, but she seemed to refuse to buy Desitin."  George did not send a diaper bag with the child for visits, as the goal was for appellant to show she could provide for the child during visits.

{¶ 20} George testified during visits between appellant and the child, appellant was told not to use her phone, but she would sneak it anyway.  Once, appellant's phone was taken away from her.  If the child had a phone during his visit with appellant, "[i]t

6.

wasn't good" when he returned to the foster home, as "it caused all the behaviors to come up again."

{¶ 21} George testified that after appellant left the group home, there were visits at her apartment, but those visits ended because appellant was not home when the caseworker brought the child for a visit. George recalled appellant would often cancel visits with the child, and on February 4, 2019, appellant called to cancel the next day's visit because she said she was ill. However, George saw appellant with two friends at Walmart on February 5, 2019, and appellant "was playing around and acting perfectly fine." George then saw appellant driving her car, although appellant did not have a driver's license.

{¶ 22} George testified appellant went from January 26, 2019, until June 19, 2019, without visiting the child. When the child was not having consistent visits, his behaviors at the foster home improved. After the June 19, 2019 visit, the child "seemed to be very confused * * * and started more behaviors" like throwing things and grabbing things. Appellant's last visit with the child before he left the Georges' care was in mid-July 2019, the day before his third birthday. To George's knowledge, appellant did not do anything for the child's birthday. George has been in contact with the child's new foster parents to support them and give them information.

### Caseworker Lisa Mullholand

{¶ 23} Lisa Mullholand testified she was an ongoing caseworker for appellee, and worked with appellant, father and the child from August 1, 2018, through February 2019.

7.

At first, appellant lived in an independent living group home in Findlay, Ohio, and the child lived in a foster home in Bluffton, Ohio. In late December 2018, appellant turned 18 years old, left the group home and moved into her own apartment. At that time, appellant had over $5,000. Appellant bought a car and allowed her sister to drive it. The sister totaled the car and because appellant only had liability insurance on the car, she lost about $3,000. Appellant always had her hair and nails done, which cost upwards of $300, and she wore new clothes. By the end of February 2019, appellant had no money.

{¶ 24} Mullholand testified appellant is a hard worker and while appellant was in care, she worked as many hours as she could until she was told to decrease her work hours so she could fit in parenting time and school. While in the group home, appellant visited with the child twice a week. When appellant lived in the apartment, the child visited four times between December 2018 and February 2019. During those visits, there were issues because appellant wanted to fill out a Medicaid application, and appellant had to be reminded many times to water down the juice for the child and not to overfeed him.

{¶ 25} Mullholand stated appellant had a difficult time planning her day. Appellant had stopped attending counseling because she did not feel she needed it, she was not going to school and she did not go to doctors' appointments for her medical condition. Appellant was also unable to show her medications had been refilled or that she was taking the medicines. In addition, appellant had numerous boyfriends and many people in and out of her apartment. Appellant's sister and the sister's boyfriend were living at the apartment at one point, were doing drugs and were involved in incidents of

8.

domestic violence. Mullholand observed appellant was not doing any of the things she should have been doing to get her child back.

{¶ 26} In January 2019, appellant's behavior was off, as her movements were slow, her eyes were half closed and bloodshot. Mullholand was concerned that appellant was using drugs, which appellant denied. On January 11, 2019, appellant tested positive for marijuana. By February 2019, appellant admitted she smoked pot, and tested positive for marijuana on February 25, 2019.

{¶ 27} Also by February 2019, because of the back and forth visitation, Mullholand made a referral for appellant's visits with the child to be held at Harmony House in Findlay. While appellant was not happy because it cost money to go to Harmony House, it was obvious to Mullholand that appellant was driving and had money for everything else. A program, called Bridges, would have helped appellant pay for the visits and a variety of other things, if appellant maintained a minimum school schedule. There were also concerns that appellant was driving without a driver's license, as she only had a permit.

{¶ 28} Mullholand opined appellant tried to act like a parent but because of her age and wanting to be a teenager, she did not make the child her priority. Appellant's last visit with the child was January 25, 2019. When Mullholand last met with appellant, on February 25, 2019, appellant looked the worst Mullholand had seen her in a long time. Appellant was pale, her hair was unkempt and she was not feeling well. In addition, appellant was going to be evicted from her apartment because she did not have money to

9.

pay her rent and bills. Appellant said a friend had robbed her and she had few friends as she trusted people she should not have trusted.

{¶ 29} Mullholand acknowledged that appellant was not at the hearing, which was not surprising because sometimes appellant's coping skills are avoidance. When asked if the 144-day period that appellant did not visit with the child was avoidance, Mullholand stated no, "[t]hat's 'I'm too busy doing my own thing.'"

**Caseworker Jackie Hamann**

{¶ 30} Jackie Hamann testified she was a caseworker for appellee, and was assigned to work with appellant and the child when appellee received custody of both of them on October 31, 2017. Hamann was the caseworker until July 2018, when Mullholand was assigned to work with appellant and the child. Hamann was then reassigned to work with appellant and the child on March 1, 2019.

{¶ 31} Initially, appellant was placed in independent living, which is a group home for girls, and had case plan services including "mental health counseling, drug and alcohol," and Help Me Grow with the child. The child was placed with the Georges from October 31, 2017, to September 16, 2019, when he was moved to a foster-to-adopt home.

{¶ 32} Appellant's visits with the child were always supervised. Early on, appellant was in contact with a lot of boys, who she met at the park. Although Hamann had many conversations with appellant about the timeframes and focusing on the child, appellant did not visit with the child from January 25, 2019, until June 19, 2019.

10.

{¶ 33} On March 20, 2019, Hamann met with appellant at the office. Appellant had just gotten back from a week's vacation in North Carolina with her mother and grandmother to visit her grandfather.

{¶ 34} On April 24, 2019, Hamann went to Fremont, Ohio, to an apartment where she had heard appellant was living. Hamann followed appellant's sister's boyfriend to the apartment, he opened the door, went in, then slammed the door in Hamann's face. After Hamann knocked on the door several times, another man opened the door and asked what she wanted. Hamann asked for appellant, the man slammed the door and a few minutes later, appellant came out into the hallway. Appellant told Hamann the man was her boyfriend, she had known him for a long time and she lived with him. Appellant admitted she had lied to Hamann previously about how long she had known her boyfriend. When Hamann told appellant about the timeframes and there was not a lot of time left, appellant yelled and cussed at Hamann, then stormed into the apartment.

{¶ 35} Hamann next saw appellant on May 20 or 21, 2019, and appellant was still with her boyfriend and was not doing services. Appellant had not gone to TASC (Treatment Alternatives to Street Crime), she was not in counseling and the Bridges program had closed her case for noncompliance. Hamann met with appellant on May 29, 2019, and appellant said she was no longer with her boyfriend.

{¶ 36} In June 2019, Hamann visited with appellant, who had had her assessment and just started TASC. Appellant was referred to drug and alcohol treatment at Firelands, but went for mental health treatment instead. Hamann testified that on June 16, 2019,

11.

appellant posted on Facebook "'Happy Father's Day, baby… 'you're such a great dad, and I love you the way you are with your kids.' 'You are amazing.'" Appellant also posted pictures of her boyfriend.

{¶ 37} On July 9 and 17, 2019, appellant tested positive for cocaine. Also in July 2019, appellant told Hamann she was no longer with her boyfriend because he was abusive and had hit her and bit her leg. In August 2019, appellant went back to her boyfriend. From June 2019 to August 2019, there were 11 visits scheduled for appellant and the child; appellant visited the child five times.

{¶ 38} For a while, Hamann could not locate appellant. On September 5, 2019, appellant called and said she was back in town and with her boyfriend. Appellant had been in Columbus, Ohio, living with her uncle, but it did not go well because he is an alcoholic.

{¶ 39} Hamann had attempted to locate a family member who could care for the child, but no one was suitable.

## GAL

{¶ 40} Angela LeForce testified she was appointed, in May 2018, as the GAL to represent the child. She had little contact with appellant and father, but she did talk with them at review hearings. LeForce observed one home visit between appellant and the child while appellant lived at the group home.

{¶ 41} On March 5, 2019, LeForce saw appellant at the review hearing and scheduled a home visit at appellant's apartment for March 22, 2019. On that day, when

12.

LeForce went to appellant's apartment and knocked on the door, there was no answer. There was a letter on the apartment door, so LeForce took a picture of the letter. The letter was addressed to appellant, was from Findlay Digital Academy, and had a handwritten note that said "'Please read, important explanation.'" The letter provided notice of appellant's non-compliance with her GED classes. LeForce tried to call and email appellant, but never received a response. LeForce acknowledged appellant was a hard worker and had saved money, but noted appellant started to decline and then everything fell apart. LeForce noted appellant did not see the child from January 25, 2019, until June 2019.

{¶ 42} LeForce observed the child at his foster home, talked to the foster mother and spoke with caseworker Hamann. LeForce looked at the best interest factors and determined the child requires permanency. In her report, LeForce recommended that permanent custody of the child be awarded to appellee for purposes of adoption.

### Trial Court's Decision

{¶ 43} The trial court noted it took judicial notice of all of the records contained in the court's file, including all previous findings and judgment entries. In addition, exhibits A through H were admitted by the court into evidence. The court made certain findings, by clear and convincing evidence, including: the child has been in appellee's custody since October 31, 2017; the child was adjudicated dependent; mother was sporadic with her efforts to complete case plan services; mother failed to prioritize the child in her life, spending her available time and financial resources in other areas; mother struggled with

13.

drug use, employment, housing, transportation and other basic life matters; and mother had gaps in seeing and visiting the child, as long as 144 days.

{¶ 44} The trial court concluded the child has been legally abandoned by appellant, the child has been in the temporary custody of appellee for at least 12 months of 22 consecutive months, and the child cannot be placed with either parent within a reasonable period of time, and should not be placed with either parent.  The court further concluded the permanent placement of the child in appellee's custody is clearly in the child's best interest.  In addition, the court concluded appellee made reasonable efforts for the child to return home, which efforts were unsuccessful.  Lastly, the court concluded appellee made reasonable efforts to establish a permanency plan for the child's placement in appellee's permanent custody with the goal of finding an appropriate adoptive family for him.

**Law**

**Standard - Permanent Custody**

{¶ 45} A trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence.  *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28.  "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered

testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). Hence, a judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 46} The juvenile court may grant permanent custody of a child to a children services agency if the court finds, by clear and convincing evidence: (1) the existence of at least one of the four factors set forth in R.C. 2151.414(B)(1)(a) through (d), and (2) the child's best interest is served by granting permanent custody to the agency. *In re M.B.*, 10th Dist. Franklin No. 04AP755, 2005-Ohio-986, ¶ 6; R.C. 2151.353(A)(4). Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

### Factors under R.C. 2125.414(B)(1)

{¶ 47} R.C. 2125.414(B)(1)(a), (b) and (d) state:

(a) The child is not abandoned or orphaned * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

\* \* \*

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period \* \* \*.

**R.C. 2151.414(E)**

{¶ 48} R.C. 2151.414(E) requires a trial court to find that a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with either parent if any one of sixteen factors are met. R.C. 2151.414(E)(1)-(16). R.C. 2151.414(E)(4) and (10) provide:

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

\* \* \*

(10) The parent has abandoned the child.

**Appellant's First Assignment of Error**

{¶ 49} Appellant contends the trial court erred in finding, by clear and convincing evidence, that the child had been in appellee's temporary custody for 12 of 22 months. Appellant argues there is no evidence in the record as to who was legally responsible for appellant and the child's removal from their home on October 31, 2017, or what specific behaviors or conditions necessitated the child's removal into appellee's temporary

custody. Appellant also asserts there was no testimony at the final hearing regarding the facts of the removal or in support of the court's finding of dependency, nor was there a judgment entry of adjudication entered as an exhibit. Appellant submits the case docket and individual docket entries, without testimonial evidence at the permanency hearing, do not represent clear and convincing evidence of the dispositional timeline.

{¶ 50} Appellant further argues, assuming the docket entries are sufficient proof, appellee's temporary custody of the child lapsed between May 1, 2019 and June 5, 2019, as there is nothing in the record that temporary custody was extended prior to May 1, 2019. Appellant notes on October 10, 2018, a docket entry states temporary custody is extended until May 1, 2019, then on June 4, 2019, a docket entry again extended temporary custody. On June 5, 2019, appellee filed a motion for permanent custody, and the matter set for a dispositional hearing. Thus, appellant maintains, appellee's temporary custody of the child terminated on May 1, 2019, and the motion for permanent custody was not filed 30 days before the termination of temporary custody.

{¶ 51} Appellee counters two witness testified at the permanent custody hearing regarding the child's removal from the home into appellee's temporary custody on October 31, 2017, and the trial court took judicial notice of all of the previous entries in the court's case file. Appellee contends the judgment entries show a clear and convincing timeline that the child was continuously in appellee's custody from October 2017 until appellee filed its motion for permanent custody in June 2019. In particular, appellee observes it filed a motion to extend temporary custody on March 1, 2019, which

17.

the court granted on March 11, 2019, by consent of all of the parties at the hearing, including appellant.

## Law and Analysis

{¶ 52} At a dispositional hearing, "[t]he court may admit any evidence that is material and relevant, including, but not limited to, hearsay, opinion, and documentary evidence." R.C. 2151.35(B)(2)(b). In addition, a court may take judicial notice of prior proceedings in the same case. *See State v. Treen*, 6th Dist. Ottawa No. OT-99-060, 2000 WL 639001, (May 19, 2000); Evid.R. 201. *See also Pollard v. Elber*, 2018-Ohio-4538, 123 N.E.3d 359, ¶ 13-14 (6th Dist.).

{¶ 53} Upon review, we find the trial court did not err in finding, by clear and convincing evidence, that the child was in appellee's temporary custody for at least 12 of 22 months before the permanent custody motion was filed. The record shows the child has been in appellee's temporary custody, uninterrupted, since October 31, 2017, and appellee filed its motion for permanent custody on June 5, 2019. We therefore find the evidence does not support appellant's contention that appellee's temporary custody of the child terminated on May 1, 2019.

{¶ 54} The evidence in the record which supports the court's finding consists of the testimony of the foster mother, caseworkers and the GAL from the permanent custody hearing, as well as the court's previous findings and judgment entries, of which the court properly took judicial notice. The relevant, previous rulings include: the October 31, 2017 magistrate's order placing the child in appellee's temporary custody; the

18.

December 8, 2017 magistrate's decision stating appellant consented to a finding that the child was dependent; the December 10, 2018 magistrate's decision extending appellee's temporary custody of the child until May 1, 2019; and the March 11, 2019 magistrate's decision extending appellee's temporary custody of the child until November 1, 2019.

{¶ 55} We conclude the trial court's finding that the child was in appellee's temporary custody for at least 12 of 22 months before the permanent custody motion was filed, was supported by competent, credible evidence and was not against the manifest weight of the evidence. *See* R.C. 2125.414(B)(1)(d). Accordingly, appellant's first assignment of error is found not-well taken.

## Second Assignment of Error

{¶ 56} Appellant argues the evidence supporting the trial court's finding that the child had been abandoned was not clear and convincing, and/or the court's decision was against the manifest weight of the evidence. Appellant contends appellee's temporary custody of the child ended on May 1, 2019, so the child should have been returned to her, and even if she had stopped visiting the child, the period of time after January 25, 2019, until May 1, 2019 was approximately 95 days. Appellant also submits there were "the extenuating circumstances of mother's new driver's license" during that time frame. For these reasons, appellant claims she did not abandon the child.

## Law and Analysis

{¶ 57} R.C. 2151.011(C) states "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than

19.

ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." This provision creates a presumption of abandonment, which may be rebutted. *In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, 916 N.E.2d 1110, ¶ 33 (10th Dist.).

{¶ 58} Upon review, the record shows appellant and the child were placed in appellee's temporary custody on October 31, 2017. Initially, appellant visited with the child regularly but shortly after she turned 18 years old and left appellee's custody, she stopped visiting with the child. The GAL, the foster mother and a caseworker all testified at the permanent custody hearing that from late January 2019, until June 19, 2019, appellant did not visit the child. We find this evidence supports a presumptive finding that appellant legally abandoned the child by failing to have contact for over 90 days.

{¶ 59} To rebut this presumption, appellant offered "the extenuating circumstances of [her] new driver's license," as well as the claim that appellee's temporary custody of the child terminated on May 1, 2019. We have already established the evidence did not support appellant's claim that appellee's temporary custody of the child terminated on May 1, 2019. Even if we were to accept appellant's claim, the period of time appellant did not visit with the child was approximately 95 days. Further, appellant's assertion of "the extenuating circumstances of [her] new driver's license," with no elaboration or explanation is insufficient to rebut the presumptive finding that she abandoned the child by failing to visit him for more than 90 days. We therefore find the reasons presented by appellant do not rebut the presumption that she abandoned the child.

20.

{¶ 60} The evidence in the record shows appellant did not visit the child from January 26, 2019, until June 2019, which is well over the 90-day statutory presumptive period of abandonment. We conclude there was clear and convincing evidence to support the trial court's finding that appellant legally abandoned the child, and this finding was supported by competent, credible evidence and was not against the manifest weight of the evidence. *See* R.C. 2125.414(B)(1)(b). Accordingly, appellant's second assignment of error is not well-taken.

### Third Assignment of Error

{¶ 61} Appellant asserts the evidence supporting the trial court finding that the child could not be returned to her was not clear and convincing, and the court's decision was against the manifest weight of the evidence. She contends there was no testimony as to the basis of the child's initial removal from the home, and there was no clear and convincing evidence that the child's social, medical and communication issues supported his removal from the home or the termination of her parental rights. Appellant also argues since she was emancipated in late December 2018, which was close to the time of the motion for permanent custody and hearing, her ability to function as an adult was not fully known.

{¶ 62} Appellee counters the November 6, 2017 magistrate's decision mentioned the evidence in support of placing the child in appellee's temporary custody, and the November 22, 2017 case plan set forth the concerns that caused the initial removal from the home. Appellee observes appellant consented to the contents of the case plan, in

21.

which the case plan services were listed, but she did not utilize the services. Appellee notes the caseworkers' testimony and the evidence presented at the hearing established that appellant failed to complete the services, and the foster mother and caseworkers' testimony detailed appellant's housing, financial, medical, visitation and other issues. Lastly, appellee submits appellant did not even attend the final hearing, as she had something else scheduled.

**Analysis**

{¶ 63} Upon review, the record shows the child initially lived with appellant at appellant's parents' home until appellant and the child were removed due to appellant's mother's drug use and mental health issues. The child then lived with appellant's grandmother while appellant stayed with her 18-year-old boyfriend, until a domestic violence incident occurred, and appellant and the child were placed with S.K.

{¶ 64} In early October 2017, the child resided with S.K. while appellant was in the juvenile justice center, but S.K. did not want appellant to return to the home when she was released from detention. In late October 2017, appellee took emergency temporary custody of appellant and the child, and placed appellant in a group home and the child in a foster home. When appellant turned 18 years old, she moved into her own apartment. Thereafter, appellant had issues with drugs, maintaining stable housing, being financially responsible, attending to her health and medical needs, associating with problematic people, failing to regularly visit the child, failing to make the child a priority and failing to complete case plan services.

22.

{¶ 65} The record further reveals the child's behaviors improved while he was in foster care. Given the child's young age, he was not able to express his wishes. However, the GAL recommended that permanent custody of the child be granted to appellee so that the child could be adopted.

{¶ 66} We find there was clear and convincing evidence supporting the trial court's finding that the child could not be returned to appellant, and the court's decision was not against the manifest weight of the evidence. The evidence in the record shows appellant demonstrated a lack of commitment toward the child and an unwillingness to provide an adequate permanent home for the child. *See* R.C. 2151.414(B)(1)(a). Accordingly, appellant's third assignment of error is not well-taken.

{¶ 67} On consideration whereof, the judgment of the Sandusky County Court of Common Pleas, Juvenile Division, is affirmed. Appellant is ordered to pay the court costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                      _____
                                                           JUDGE

Arlene Singer, J.

Thomas J. Osowik, J.                       _____
CONCUR.                                                JUDGE

                                                       _____
                                                           JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.